In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 06-4310

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL HATTEN-LUBICK,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 117—**Blanche M. Manning,** *Judge.*

————————

ARGUED NOVEMBER 5, 2007—DECIDED MAY 12, 2008

————————

Before POSNER, EVANS, and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge*. Michael Hatten-Lubick (his nickname is "Bo-Hunky") appeals from his conviction and sentence for various narcotics-related offenses.

Hatten-Lubick was indicted with a codefendant, Isaac Norfleet. Specifically, Hatten-Lubick was charged with conspiracy to distribute and possess with the intent to distribute in excess of 50 grams of cocaine base and in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 846, with two substantive counts of possession with intent to distribute cocaine, in violation of U.S.C.

§ 841(b)(1), and with three counts of using a telecommunications facility in connection with the drug offenses, in violation of U.S.C. § 843(b). He was tried to the court. At trial, the government limited its evidence to distribution of cocaine, not cocaine base. The court found him guilty on all counts. He was sentenced to 120 months on the drug charges, with sentences of 48 months on the other counts to run concurrently. A $5,000 fine was also imposed.

The evidence at trial included telephone conversations intercepted with Title III wiretaps on the telephone of a fellow dealer, Rodney Bew. Bew, facing a long sentence of his own, cooperated with the government in exchange for a recommendation for a downward departure; his testimony was significant.

Bew supplied other dealers with cocaine and crack cocaine in and near the cities of Joliet and Lockport, Illinois. Bew had several suppliers and usually purchased cocaine in amounts ranging from 9 ounces (a quarter kilogram) to a kilogram at a time or, in the jargon of these dealers, a "rim" (as in tires) or a "set of rims." When Bew was transporting cocaine, he brought two "runners" or "mules" with him. The runners would drive a car carrying the drugs and Bew would drive behind them and act as a distraction. If a police officer attempted to stop the runners' car, Bew would deliberately commit traffic offenses so that the officer would stop him, rather than the runners, thus allowing the runners to slip away. If the runners were stopped, the passenger in the car was supposed to throw the cocaine away or jump out of the car and run away with the drugs.

Hatten-Lubick had known Bew since childhood and often purchased large amounts of cocaine from him. When he needed a supply of cocaine, Hatten-Lubick would call

Bew, who would call a supplier. Once everyone agreed on the amount of drugs to be purchased and the price, Hatten-Lubick would follow Bew to meet the supplier. Bew tried to prevent Hatten-Lubick from "jumping his back" by dealing directly with the suppliers, thus cutting Bew out of the deal—something that had happened on occasion.

The evidence showed that the arrangement started sometime in 2000. Bew testified that in 2001 and 2002 he brokered five or more deals for Hatten-Lubick with Brent Terry at a Boston Market restaurant in Calumet City. In 2001, Bew brokered deals between Hatten-Lubick and "Nemo" at Park Electronics, a store located at 42nd and Ashland Avenue in Chicago. In 2003, Bew met Alfonso Perez and began conducting transactions with him and brokered deals with him for Hatten-Lubick.

On June 25, 2003, Bew drove his car, closely followed by Hatten-Lubick and Norfleet in Hatten-Lubick's car, to the parking lot of a Subway restaurant in Berwyn. Bew gave Hatten-Lubick's money to Perez in exchange for a kilogram of cocaine. In return for Bew's services in arranging the transaction, Hatten-Lubick paid Bew $1,000.

After that transaction, Bew and Hatten-Lubick discussed their dealings with Perez during a telephone call, which was intercepted by the FBI's wiretaps. Hatten-Lubick expressed his view that Perez should be reducing the price of the cocaine. Bew assured him the price would drop if they continued to buy from Perez.

A few days later, Hatten-Lubick called Bew, in another intercepted conversation, and asked for "the usual," which Bew understood to mean that Hatten-Lubick wanted to purchase a kilogram of cocaine. Bew asked Perez for the cocaine, but he did not have enough on hand to fill the order.

Two days later, though, on July 16, Perez called Bew and asked whether they still wanted the cocaine. Bew, in turn, called Hatten-Lubick and during the call informed Hatten-Lubick that Perez had raised the price. Hatten-Lubick got angry and rejected the deal. But after further discussions, a price was agreed on, and Bew, Hatten-Lubick, and Norfleet drove to Berwyn to purchase the kilogram of cocaine. They met at a Burger King, and Perez told them to follow him to his mother's house.[1] They stopped in an alley behind a garage, from which Perez retrieved a Burger King bag that carried, not a double Whopper, but a kilo of cocaine. In exchange for the cocaine, which was given to Hatten-Lubick, Bew gave Perez Hatten-Lubick's money. Bew, Hatten-Lubick, and Norfleet started to drive back to Joliet.

But, of course, because the telephone call making the arrangements for the deal was intercepted, the FBI had the entire operation under surveillance. FBI Special Agent Ron Reddy arranged for an Illinois state trooper, Chad Brody, to be stationed along Interstate 55, the route to Joliet. When Hatten-Lubick drove past Trooper Brody, the FBI instructed the trooper to pull him over. Bew, using his modus operandi, tried to intervene by driving erratically and closely following Hatten-Lubick's car to prevent the trooper from getting behind it. Bew also began to weave back and forth on the road, twice almost hitting the trooper's car. Despite Bew's best efforts, Trooper Brody was undeterred and stopped Hatten-Lubick, not Bew.

---

[1] For interesting reading, see *Freakonomics* by Steven D. Levitt and Stephen J. Dubner questioning why, if drug dealers are so rich, they live with their mothers.

When the pinch was made, Trooper Brody summoned his dog, Buster, into action. Buster was certified by the Illinois State Police Canine Facility to detect the odor of narcotics, including cocaine. He alerted to the passenger door of the car. Under the passenger seat, Brody found the kilogram of cocaine and arrested Hatten-Lubick and Norfleet.

But, per Agent Reddy's instructions, both men were released without charges later that night. In September, Hatten-Lubick's attorney arranged for him to meet with FBI agents. During an interview, Hatten-Lubick admitted the Burger King incident but refused to talk about previous drug dealings.

In this appeal, Hatten-Lubick raises several issues: whether the evidence could sustain a conviction for conspiracy, whether his trial counsel was ineffective, whether the court's calculation of his drug quantity was erroneous, whether it was error to increase his sentence based on a supervisory role in the offense, and whether it was plain error for the judge not to set a payment schedule for the fine.

Hatten-Lubick's claim that the evidence was insufficient to sustain a conviction for conspiracy was first raised in his motion, pursuant to Federal Rule of Criminal Procedure 29, after the government presented its case. The reasons for denying the motion are set out in the court's amended findings of fact and conclusions of law after trial. We review the denial of a motion for judgment of acquittal *de novo*, looking to see whether, viewing the evidence in the light most favorable to the government, it is sufficient to sustain the conviction. *United States v. Hausmann*, 345 F.3d 952 (7th Cir. 2003); *United States v. Jones*, 222 F.3d 349 (7th Cir. 2000). We reverse a convic-

tion only if there is no basis for a fact finder to find the
essential elements of the crime beyond a reasonable doubt.
*United States v. McCaffrey*, 181 F.3d 854 (7th Cir. 1999). We
defer to the credibility determinations of the trial court.
*United States v. Hickok*, 77 F.3d 992 (7th Cir. 1996). In
other words, Hatten-Lubick faces a significant challenge
on this claim.

It is a challenge he does not meet. The evidence of a
conspiracy is sufficient despite Hatten-Lubick's claim that
he had merely a buyer-seller relationship with Bew. The
evidence shows otherwise. It is clear the two were
working in concert to obtain drugs. Hatten-Lubick ac-
companied Bew on trips from Joliet to Chicago to obtain
cocaine from Perez They discussed together how much
they should pay Perez. By using two cars and diversionary
tactics, they were working together, trying to distract
police from finding the drugs. They were coconspirators.
*See*, *e.g.*, *United States v. Garcia*, 89 F.3d 362 (7th Cir. 1996);
*United States v. Baskin-Bey*, 45 F.3d 200 (7th Cir. 1995).

Hatten-Lubick also claims his right to the effective
assistance of counsel was denied. We begin by noting
that because counsel is presumed effective, a defendant
bears a heavy burden in challenging his attorney's effec-
tiveness. *United States v. Jimenez*, 992 F.2d 131 (7th Cir.
1993). He must satisfy the two-prong test set forth in
*Strickland v. Washington*, 466 U.S. 668 (1984). First, he
must show that counsel's performance "fell below an
objective standard of reasonableness." Second, he must
show that there exists "a reasonable probability that, but
for counsel's unprofessional errors, the result of the
proceeding would have been different."

When a defendant raises an ineffective assistance
claim on direct appeal without supplementing the

record, his task is even harder. Without other evidence, a possible error by counsel will be presumed to be a tactical move. *United States v. Ashimi*, 932 F.2d 643 (7th Cir. 1991). Because evidence outside of the record will ordinarily be required to demonstrate the deficiency in counsel's performance, we are generally reluctant to consider claims of ineffective assistance of counsel raised for the first time on appeal. *United States v. Fish*, 34 F.3d 488 (7th Cir. 1994). However, Hatten-Lubick's claim is now before us.

He says his attorneys did not act as advocates, their performance was objectively unreasonable, and their actions prejudiced him. Specifically, he says that his 10-year sentence is twice what he could have received by pleading guilty. He faults his attorneys for concentrating on casting reasonable doubt on the conspiracy charge but failing to adequately challenge the substantive counts. There were motions to suppress evidence pending which Hatten-Lubick says could have supported a conditional plea and that there was no strategic reason for not entering such a plea. Unfortunately for Hatten-Lubick, because we have nothing but the trial record before us, we must assume that there was a strategic reason for attacking the conspiracy count. While saying this, we acknowledge that we have just determined that there was sufficient evidence of conspiracy; nevertheless, going into the trial, an attorney might think the charge could be beaten. Perhaps the lawyers were less optimistic about winning a suppression motion than they were about beating the charges at trial. But, of course, we have no way of knowing exactly what their strategy was—which is precisely the problem when this issue is raised on direct appeal.

As to the sentencing issues, we first consider Hatten-Lubick's claim that it was error to assign him a leadership role in the conspiracy. We disagree.

We review the imposition of an enhancement for the role in the offense for clear error. *United States v. Haddad*, 462 F.3d 783 (7th Cir. 2006). Clear error exists only when, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made. If there are two permissible views of the evidence, the fact finder's choice between them is not clearly erroneous. *Hickok*, 77 F.3d 992.

Under § 3B1.1 of the United States Sentencing Guidelines, the court is to make an upward adjustment when the defendant's role is that of "organizer, leader, manager, or supervisor." The enhancement varies between 2 levels and 4 levels, depending upon the number of participants and the defendant's role in the offense. The application notes to this section list seven factors relevant to the determination as to whether an adjustment is warranted. They include the exercise of decisionmaking authority, the nature of the participation, the recruitment of accomplices, the right to a larger share of the proceeds, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of authority exercised over others. The district judge determined that Hatten-Lubick's use of Norfleet as a runner made him a manager or supervisor in criminal activity that involved five or more people. She imposed a 3-level enhancement. We agree that the evidence shows that Norfleet was working for Hatten-Lubick. An intercepted phone call between Bew and Hatten-Lubick shows that prior to the transactions with Perez, Hatten-Lubick recruited Norfleet to be his runner.

The imposition of the enhancement was not clearly errone-
ous.

Hatten-Lubick also contends that it was error for the
district court to conclude that the drug amount which
could reasonably be attributed to him was in excess of
5 kilograms. Once again our review is for clear error. We
will affirm unless, after considering all the evidence, we
are left with a "definite and firm conviction" that a
mistake has been committed. *United States v. Romero*, 469
F.3d 1139, 1147 (7th Cir. 2006).

The district judge was clear that she found Bew's testi-
mony credible. Bew testified that over a four-year period
he helped Hatten-Lubick buy large quantities of cocaine
about 12 times in amounts ranging from a quarter of a
kilogram to a full kilogram. He said that on three occa-
sions he brokered transactions between Hatten-Lubick
and Perez for a kilogram each. One transaction with
Perez was in May 2003 at a gas station/car wash in Chi-
cago; the second in June of that year at a Subway restau-
rant in Berwyn, Illinois; the third was on July 16, the day
Buster found the cocaine in Hatten-Lubick's car. Other
purchases were from Brent Terry and Nemo, Jo-Jo, and
Hezikiah Paine. The transactions with Perez account for
3 kilograms. If the remaining nine transactions were each
for only quarter kilograms (which seems unlikely), the
result is, nevertheless, in excess of five kilograms.

Hatten-Lubick also claims, however, that he should not
be held accountable for any drug transaction prior to
November 2002 because the indictment alleged that he
participated in a drug distribution conspiracy "from in
or about November 2002 to in or about June 2004." The
date of the offense is, however, not an element of the
crime. To prove the conspiracy, the government must

show beyond a reasonable doubt (1) that two or more people agreed to commit a criminal act and (2) that the defendant knowingly and intentionally joined in the agreement. *United States v. Johnson*, 437 F.3d 665 (7th Cir. 2006). The district judge considered the transactions prior to November 2002 as part of the offense of conviction. She stated:

> Bew obtained much of the cocaine and other drugs he sold in Joliet from suppliers in Chicago. One of the people for whom Bew obtained drugs was Hatten-Lubick, a friend since childhood. Over a four-year period, Bew helped Hatten-Lubick buy large quantities of cocaine about 12 times in amounts ranging from a quarter of a kilogram to a full kilogram. Sometimes Hatten-Lubick and Bew would pool their money to buy large quantities of cocaine, which they would then split between themselves. But mostly, Hatten-Lubick used Bew as an intermediary in dealing with Bew's suppliers. In exchange for Bew's work as an intermediary, Hatten-Lubick would pay him between $1,000 and $2,000 for each kilogram purchased.

Even were the transactions not considered part of the offense of conviction, they would qualify as relevant conduct under U.S.S.G. § 1B1.3(a)(2). There was no error in the drug calculation.

Finally, Hatten-Lubick argues that his sentence must be vacated so that the district court can clarify a payment schedule for the $5,000 fine imposed on him as a result of his conviction. As to a payment schedule, the judgment says only that "While on supervised release, defendant shall pay monthly installments of 10% of net monthly income." Although not clearly stated, Hatten-Lubick's argument must be that because he was required

to begin payment in prison and the payment schedule in the judgment applied only after his release, the Bureau of Prisons unlawfully set a schedule for payments while he was in prison.

Hatten-Lubick did not raise this issue in the district court and our review of the issue is, therefore, only for plain error. We look to see whether there was error, that was plain, and whether the error "affect[s] substantial rights." We consider whether to exercise our discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993).

We have recently reexamined the issue of plain error review of the alleged improper delegation of authority to either the probation department or the Bureau of Prisons (BOP). *See United States v. Tejeda*, 476 F.3d 471 (7th Cir. 2007) (leaving scheduling for drug testing after release to the probation department, while assumed to be error, did not require correction under the plain error doctrine because leaving scheduling to the probation department did not affect Tejeda's substantial rights); *United States v. Sawyer*, ___ F.3d ___ (7th Cir. 2008) (failure to set a schedule for restitution payments following release and leaving the payment schedule to the probation department in the case of two of the three defendants before the court was error that was plain but the error had no affect on the defendants' substantial rights and thus did not merit relief).

Both Tejeda and the relevant defendants in *Sawyer* (Michael Sawyer and Terrell Rogers) objected to what the probation department did after they were released from prison. In contrast, what the third defendant in *Sawyer* (Patrick Duncan), the defendant in *United States v. Ellis*, ___

F.3d ___ (7th Cir. 2008), and Hatten-Lubick contend is that there was some improper delegation of authority to the BOP for the payment of fines or restitution while they were in prison. It is not a claim that can be sustained; there is no error, say nothing of plain error. In *Sawyer* we said:

> Thus we hold that leaving payment during imprisonment to the Inmate Financial Responsibility Program is not an error at all, let alone a plain error. The statute requires the judge to set a schedule if the defendant cannot pay in full at once, . . . but it does not say when the schedule must begin. We hold today that it need not, and as a rule should not, begin until after the defendant's release from prison. Payments until release should be handled through the inmate Financial Responsibility Program rather than the court's auspices.

In *United States v. Ellis*, ___ F.3d ___ (7th Cir. 2008), we reaffirmed our decision in *McGhee v. Clark*, 166 F.3d 884, 886 (7th Cir. 1999), that when a fine is payable immediately, a "payment schedule established by the BOP does not conflict with the sentencing court's immediate payment order." The door is firmly shut on Hatten-Lubick's claim.

Accordingly, Hatten-Lubick's conviction and sentence are AFFIRMED.