# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3706

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VICTOR SAINZ-PRECIADO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 381—**Ronald A. Guzman**, *Judge.*

ARGUED DECEMBER 11, 2008—DECIDED MAY 27,2009

Before MANION, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Victor Sainz-Preciado pleaded guilty to conspiracy and attempt to distribute more than 5 kg of cocaine, but the district court found that he was responsible for more than 150 kg of cocaine for sentencing purposes and imposed a 262-month sentence. On appeal, Sainz-Preciado challenges the district court's drug quantity finding and application of the United States Sentencing Guidelines. Finding no error in the court's sentencing determinations, we affirm Sainz-Preciado's sentence.

## I. Background

Sainz-Preciado and Juan Jose Mena-Aguayo participated in an operation to distribute cocaine imported from Mexico across the United States. Mena-Aguayo would pick up cocaine shipments that arrived in Los Angeles and drive them to Chicago, where Sainz-Preciado would accept delivery. The two men agreed to make one such delivery in April 2004. In Los Angeles, Mena-Aguayo loaded 20 kg of cocaine into a secret compartment of his SUV and began the drive to Chicago. He made it as far as Iowa, where, on April 9, state police pulled him over and discovered the drugs. When questioned by the state police, Mena-Aguayo confessed that he had made similar cocaine deliveries to Sainz-Preciado in Chicago on two prior occasions. However, after the state police turned him over to the Drug Enforcement Agency ("DEA"), Mena-Aguayo changed his story, telling federal agents that he had made nine prior deliveries to Sainz-Preciado.

The DEA enlisted Mena-Aguayo's help to catch Sainz-Preciado in a controlled drug delivery, instructing Mena-Aguayo to contact Sainz-Preciado as though he had arrived in Chicago without incident. On April 10, in a series of recorded conversations, Mena-Aguayo contacted Sainz-Preciado and arranged to deliver the 20 kg of cocaine that he had brought from Los Angeles. During these conversations, the men were able to communicate their whereabouts and plan the logistics of the delivery using short, nondescript terms, apparently a code. For example, in his initial phone call to Sainz-Preciado, Mena-

Aguayo stated that he had arrived at "the house," and Mena-Aguayo told Sainz-Preciado that he would meet him "at the seafood." Shortly after this call, both Sainz-Preciado and Mena-Aguayo traveled separately to a nearby Mexican seafood restaurant where they had also met during prior drug transactions.

Upon arriving at the restaurant, Sainz-Preciado expressed surprise that Mena-Aguayo had brought "only 20" kg of cocaine, implying that this amount was lower than previous shipments. Sainz-Preciado then stated that he would send his "buddy" to complete the transaction, which Mena-Aguayo understood to mean that one of Sainz-Preciado's associates would arrive and take physical delivery of the cocaine. Sainz-Preciado told Mena-Aguayo to wait at the house while he left and contacted his "guy" to collect the drugs.

Shortly after the men left the restaurant, Sainz-Preciado called Mena-Aguayo and said that they needed to change their delivery plans, as Sainz-Preciado feared that the police were following him. Sainz-Preciado told Mena-Aguayo to meet him "over here" where they had "bought the tapes," which Mena-Aguayo recognized as a Walgreens store where the men had bought duct tape to wrap the money collected from a previous drug deal. Sainz-Preciado's fears were, of course, justified, as federal agents were monitoring his conversations with Mena-Agauyo and tracking his movements. After Mena-Aguayo met Sainz-Preciado at the Walgreens parking lot and drove him into downtown Chicago, agents arrested Sainz-Preciado.

On June 8, 2005, Sainz-Preciado pleaded guilty to conspiracy under 21 U.S.C. § 846 to distribute more than 5 kg of cocaine, in violation of 21 U.S.C. § 841(a)(1), and attempted possession with intent to distribute more than 5 kg of cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Prior to sentencing, Sainz-Preciado submitted his "Version of Facts," in which he claimed that he had participated in only two drug deliveries with Mena-Aguayo, including the April 2004 transaction that led to his arrest. Sainz-Preciado also claimed that he was a mere underling in the drug operation, taking his instructions from Victor Ley, Mena-Aguayo's brother-in-law. According to Sainz-Preciado, Ley called Sainz-Preciado from Mexico and told him when Mena-Aguayo would make a cocaine delivery, how to meet Mena-Aguayo in Chicago, and who to call to take physical delivery of the drugs. Sainz-Preciado also claimed that immigration officials sent him back to Mexico following his March 31, 2003 arrest for illegal entry, meaning that he could not have accepted deliveries from Mena-Aguayo from that date until August 2003, when he made his way back to Chicago.

At his August 7, 2007 sentencing hearing, Sainz-Preciado declined to testify in support of his version of facts. Mena-Aguayo, on the other hand, did testify for the government and told a story that conflicted with Sainz-Preciado's version. Consistent with his confession to DEA agents, Mena-Aguayo testified that he made a total of ten cocaine deliveries to Sainz-Preciado between March 2003 and April 2004, including the final, controlled delivery. During each of these transactions, Sainz-Preciado

paid Mena-Aguayo $400,000 to $600,000 for 20 to 34 kg of cocaine. Mena-Aguayo further testified that Sainz-Preciado never accepted the shipment personally but, as with the April 10, 2004 transaction, called various associates to pick up the drugs. As for Victor Ley's purported control over the Chicago operation, Mena-Aguayo acknowledged that he worked for Ley and that Sainz-Preciado was speaking to Ley on the phone throughout the controlled delivery. However, Mena-Aguayo also stated that Ley had nothing to do with the details of picking up the drug shipments that arrived in Chicago.

To show that Sainz-Preciado and Mena-Aguayo had developed a regular course of conduct for the cocaine shipments, the government introduced the transcripts of the April 10, 2004 conversations between the two men. Referring to the transcripts, Mena-Aguayo explained that he and Sainz-Preciado quickly recognized terms like "house" and "seafood" because they had established common meeting places from their nine prior drug deals. They had also developed common delivery procedures; by simply promising to "take care of things," Sainz-Preciado was able to communicate to Mena-Aguayo that he was summoning his associates to pick up the drugs.

Faced with Sainz-Preciado's and Mena-Aguayo's conflicting claims regarding the number of drug deals, the district court chose to credit Mena-Aguayo's testimony and concluded that Sainz-Preciado participated in nine or ten cocaine deliveries between 2003 and 2004. The court found Mena-Aguayo to be a convincing witness, noting that he testified against penal interest by ad-

mitting his own involvement in the multiple drug deliveries. Based on nine or ten shipments each involving 20 kg or more of cocaine, the court determined that the drug quantity attributable to Sainz-Preciado for sentencing purposes was more than 150 kg of cocaine. Under the United States Sentencing Guidelines, that quantity resulted in a base offense level of 38. U.S. Sentencing Comm'n, Guidelines Manual § 2D1.1(c)(1) (2004).

The court also concluded that Sainz-Preciado exercised managerial control over at least two associates, as he instructed these individuals when and where to take delivery of the cocaine shipments. In light of that finding, the court added three levels to Sainz-Preciado's offense level for his role as a "manager or supervisor" of the criminal activity. U.S.S.G. § 3B1.1(b). Correspondingly, the court rejected Sainz-Preciado's request for a two-level "safety valve" reduction in his offense level, which is available for only those drug offenders who (among other things) do not act as a "manager" or "supervisor" in the offense. U.S.S.G. § 5C1.2(a)(4); *see also id.* § 2D1.1(b)(7)[1] (providing a two-level deduction for defendants who meet the criteria of § 5C1.2(a)). Finally, because Sainz-Preciado pleaded guilty to the charged offenses, the court

---

[1] Under the most recent 2008 edition of the Guidelines, this cross-reference to § 5C1.2(a) appears in § 2D1.1(b)(11), not § 2D1.1(b)(7). This opinion cites Guidelines section numbers as they appeared in the 2004 edition under which Sainz-Preciado was sentenced. With respect to all other applicable Guidelines provisions, the 2004 and 2008 editions contain no differences in section numbers.

granted a two-level reduction under § 3E1.1(a) of the Guidelines for acceptance of responsibility. The government did not request an additional one-level reduction under § 3E1.1(b), and Sainz-Preciado did not contest the government's failure to do so.

The resulting total offense level of 39, along with Sainz-Preciado's category I criminal history, yielded an advisory Guidelines sentencing range of 262-327 months. The district court, acknowledging Sainz-Preciado's lack of criminal history but emphasizing the seriousness of distributing such large quantities of cocaine, imposed minimum-Guidelines sentences of 262 months for both the conspiracy and attempted possession offenses, to run concurrently.

On appeal, Sainz-Preciado challenges the district court's findings that he was responsible for more than 150 kg of cocaine and that he qualified as a manager of the drug operation. Sainz-Preciado also claims that he was entitled to a two-level "safety valve" reduction under § 5C1.2(a) and an additional one-level reduction for acceptance of responsibility under § 3E1.1(b). Finally, Sainz-Preciado argues that his 262-month sentence is unreasonable.

## II.  Analysis

### A.  Drug Quantity Finding

After crediting Mena-Aguayo's testimony that Sainz-Preciado participated in ten drug deliveries, the district court determined that Sainz-Preciado's "relevant conduct"

for sentencing purposes, U.S.S.G. § 1B1.3(a)(1), included the distribution of more than 150 kg of cocaine. We review the district court's finding as to drug quantity for sentencing purposes for clear error. *United States v. Romero*, 469 F.3d 1139, 1147 (7th Cir. 2006), *vacated on other grounds*, 128 S. Ct. 858 (2007) (mem.).

The district court had to choose between Mena-Aguayo's story that he made ten cocaine deliveries and Sainz-Preciado's story that he accepted only two deliveries. Given these "two permissible views of the evidence," the court's choice to credit Mena-Aguayo's testimony is not clearly erroneous. *United States v. Hatten-Lubick*, 525 F.3d 575, 580 (7th Cir. 2008). The court simply found that Mena-Aguayo's testimony was more credible than Sainz-Preciado's uncorroborated version of facts, and that credibility finding is entitled to our "great, although not absolute, deference." *United States v. Fox*, 548 F.3d 523, 529 (7th Cir. 2008). Further, the court appropriately relied on the fact that Mena-Aguayo testified against penal interest by admitting to his own participation in the ten drug deliveries. *See United States v. Mancillas*, 183 F.3d 682, 710 (7th Cir. 1999) (upholding a determination that the witness was credible based in part on the witness's self-inculpatory testimony). The government also corroborated Mena-Aguayo's testimony with the recorded April 10, 2004 conversations between Sainz-Preciado and Mena-Aguayo. *See Romero*, 469 F.3d at 1148 (noting that a DEA agent's testimony corroborated a co-defendant's testimony on his drug dealings with the defendant); *United States v. Hankton*, 432 F.3d 779, 792 (7th Cir. 2005) (finding that co-defendants' plea agreements

establishing the defendant's involvement in multiple drug transactions were fully corroborated by an FBI agent's testimony). This evidence demonstrated that the two men had developed simple, shorthand, coded terms to refer to common meeting places and delivery procedures, implying a longstanding pattern and relationship.

Sainz-Preciado argues that Mena-Aguayo's testimony lacked sufficient corroboration, such as evidence regarding the disposition of the $200,000 that Mena-Aguayo supposedly earned from his ten deliveries or hotel receipts from his ten road trips to Chicago. However, this purported lack of corroboration did not prevent the district court from crediting Mena-Agauyo's testimony, especially since that testimony was in fact significantly corroborated by the recorded conversations between Sainz-Preciado and Mena-Aguayo. *See United States v. Johnson*, 489 F.3d 794, 798 (7th Cir. 2007). Rather than simply listing ways that the government could have more fully corroborated Mena-Aguayo's testimony, Sainz-Preciado "must present evidence which would in some way rebut that testimony or demonstrate that is inaccurate" in order to show that the district court erred. *Hankton*, 432 F.3d at 793. He failed to do so.

Sainz-Preciado also points to his March 31, 2003 arrest for illegal entry and alleged removal to Mexico, claiming that he was out of Chicago from that time until August 2003 and therefore incapable of accepting deliveries from Mena-Aguayo. Even assuming that immigration officials actually removed Sainz-Preciado from the United States (the record does not establish this fact), his

April-August 2003 absence is not necessarily inconsistent with Mena-Aguayo's testimony that he accepted ten cocaine deliveries at various times between March 2003 and April 2004.

To be sure, Mena-Aguayo was not unimpeachable, as he under-reported his drug distribution history to the Iowa police following his arrest (an inaccuracy that defense counsel highlighted in his cross-examination of Mena-Aguayo). Nonetheless, a district court may credit testimony that is "totally uncorroborated and comes from an admitted liar, convicted felon, or large scale drug-dealing paid government informant." *Johnson*, 489 F.3d at 797 (quoting *Romero*, 469 F.3d at 1147). In sum, then, faced with Mena-Aguayo's sworn, unrebutted testimony and Sainz-Preciado's unsworn, uncorroborated version of facts, the district court did not clearly err in crediting Mena-Aguayo's testimony and holding Sainz-Preciado responsible for nine or ten cocaine deliveries.

## B.  Enhancement for Managerial Role Under U.S.S.G. § 3B1.1(b)

Sainz-Preciado next challenges the district court's application of a three-level enhancement under U.S.S.G. § 3B1.1(b) for his role as a manager in the offense. Like findings of drug quantity, we review the district court's finding that the defendant exercised a managerial role for clear error. *United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008).

Under § 3B1.1 of the Guidelines, a defendant receives a four-level enhancement for participation as an "organizer

or leader" of a criminal activity "that involved five or more participants or was otherwise extensive," and a three-level enhancement for participation as a "manager or supervisor" of such a criminal activity. U.S.S.G. § 3B1.1. The district court determined that Sainz-Preciado was subject to a three-level enhancement as a "manager or supervisor" because he controlled at least two individuals who took physical delivery of the cocaine shipments.

The district court's application of § 3B1.1 finds sufficient support in Mena-Aguayo's testimony that Sainz-Preciado, rather than accepting the cocaine shipments personally, directed his associates to pick up the drugs. We have recognized that a drug dealer's delegation of delivery or payment tasks may warrant the imposition of a § 3B1.1 enhancement. *See Fox*, 548 F.3d at 529-30 (upholding a § 3B1.1 enhancement for a defendant who arranged the time and location of a drug sale but directed a subordinate to make actual delivery); *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008) (finding no error in classifying as a manager a defendant who hired individuals to transport and accept substantial drug shipments); *Johnson*, 489 F.3d at 796, 798-99 (upholding a § 3B1.1 enhancement for a defendant-seller who dispatched subordinates to deliver drugs and collect payments). Accordingly, the district court did not clearly err in concluding that Sainz-Preciado's use of "runners" to take actual possession of the cocaine after he finalized the logistics of the delivery made him a manager of the criminal activity. *See Hatten-Lubick*, 525 F.3d at 580-81.

Sainz-Preciado argues that the district court erred in finding that he controlled the drug runners because it was Victor Ley, the leader of the entire drug operation, who instructed him on who to call to pick up the cocaine. According to Sainz-Preciado, the court's § 3B1.1(b) enhancement lacks any evidentiary basis because the only relevant government evidence, Mena-Aguayo's testimony, was not inconsistent with Sainz-Preciado's claim that Ley controlled his activities from Mexico.

First, Sainz-Preciado mischaracterizes Mena-Aguayo's testimony by suggesting that it was fully consistent with Sainz-Preciado's claim that Ley controlled the Chicago drug deliveries. While Mena-Aguayo acknowledged that Ley was a leader of the drug operation, he also testified that Sainz-Preciado was "doing his thing" out in Chicago and that Ley had "nothing to do" with the drug pickups. Further, even if Mena-Aguayo's testimony did not directly contradict Sainz-Preciado's claim that Ley controlled his activities, it unquestionably contradicted Sainz-Preciado's claim that he participated in only two cocaine shipments. So by crediting Mena-Aguayo's testimony, the district court necessarily found that Sainz-Preciado was a liar with respect to the critical question of how many drug deliveries the two men completed. Having discredited such an important part of Sainz-Preciado's version of facts, the court was free to discount Sainz-Preciado's version in its entirety. Finally, assuming that Ley did in fact tell Sainz-Preciado who to call to pick up the cocaine, Sainz-Preciado's resulting status as a mere middleman would not make him "immune from application of § 3B1.1." *Howell*, 527 F.3d at 649 (quoting *United*

*States v. Brown*, 944 F.2d 1377, 1381 (7th Cir. 1991)). It is Sainz-Preciado's "relative responsibility and control over other participants" that qualifies him as a manager, *id.*, and the evidence shows that Sainz-Preciado coordinated the activities of Mena-Aguayo and the drug runners. The district court did not clearly err in applying a § 3B1.1(b) enhancement for Sainz-Preciado's role as a manager.

In affirming the district court's managerial control finding, we necessarily reject Sainz-Preciado's argument that the court erred in denying his request for a two-level "safety-valve" reduction. U.S.S.G. §§ 2D1.1(b)(7), 5C1.2(a). Since one criterion for safety-valve relief is that the defendant was not a "manager" or "supervisor" in the offense, *id.* § 5C1.2(a)(4), Sainz-Preciado's § 5C1.2 argument fails along with his § 3B1.1 argument. Moreover, since the district court found that Sainz-Preciado falsely claimed that he participated in only two drug deliveries, Sainz-Preciado fails § 5C1.2(a)'s additional requirement that he truthfully provide the government with "all information" concerning his offense conduct. U.S.S.G. § 5C1.2(a)(5).

## C.  Acceptance of Responsibility Under U.S.S.G. § 3E1.1(b)

Sainz-Preciado also claims that, in addition to the two-level reduction in his offense level that he received under § 3E1.1(a) for acceptance of responsibility, he should have received an additional one-level reduction under § 3E1.1(b). The latter subsection directs the district court to decrease the defendant's offense level an additional level:

upon motion of the government stating that the
defendant has assisted authorities in the investiga-
tion or prosecution of his own misconduct by
timely notifying authorities of his intention to
enter a plea of guilty, thereby permitting the
government to avoid preparing for trial and per-
mitting the government and the court to allocate
their resources efficiently . . . .

U.S.S.G. § 3E1.1(b). The critical problem with Sainz-
Preciado's § 3E1.1(b) claim is that the government never
made a motion for a third-point reduction. We, along
with every other circuit to consider the issue, have
held that the government motion is a necessary prerequi-
site to a § 3E1.1(b) reduction. *United States v. Pacheco-Diaz*,
506 F.3d 545, 552 (7th Cir. 2007) ("[T]he district court may
not grant the third level reduction for acceptance of
responsibility absent a motion by the government."). That
rule reflects a 2003 congressional amendment to § 3E1.1(b)
that added the "upon motion of the government" lan-
guage, indicating Congress's intent to leave third-point
reductions to the government's discretion. Prosecutorial
Remedies and Tools Against the Exploitation of Children
Today ("PROTECT") Act of 2003, Pub. L. No. 108-21,
§ 401(g)(1)(A), 117 Stat. 650, 671 (2003); *see also United
States v. Beatty*, 538 F.3d 8, 13-14 (1st Cir. 2008) (discussing
the 2003 amendment and joining every other circuit to
hold that a reduction under the amended version of
§ 3E1.1(b) is contingent on the government's motion).

Sainz-Preciado suggests that the government's failure
to move for a third-point reduction in this case was a

mere oversight, resulting in part from Sainz-Preciado's own failure to explicitly request a § 3E1.1(b) motion in the proceedings below. We disagree. As the government forcefully argues on appeal, it declined to move for a third-point reduction because Sainz-Preciado never fully accepted responsibility by admitting his involvement in all ten drug transactions. So while Sainz-Preciado's early guilty plea spared the expense of a trial, the government still had to prepare Mena-Aguayo's testimony and other evidence to prove the full scope of Sainz-Preciado's criminal conduct at the sentencing hearing. This added burden to both the government and the court system gave the government good reason (if it needed one) not to file a § 3E1.1(b) motion.

### D. The Reasonableness of Sainz-Preciado's Sentence

Finally, Sainz-Preciado argues that his sentence is unreasonable because the district court failed to meaningfully consider the sentencing factors of 18 U.S.C. § 3553(a). We review the reasonableness of a sentence under an abuse of discretion standard. *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008). The district court abuses its discretion by "failing to consider the § 3553(a) factors" when selecting a sentence. *Gall v. United States*, 128 S. Ct. 586, 597 (2007). However, the court need not "discuss and make findings as to each of these factors," as long as "the record confirms meaningful consideration of the types of factors that section 3553(a) identifies." *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006); *see also Shannon*, 518 F.3d at 496 ("The court need not address every

§ 3553(a) factor in checklist fashion, explicitly articulating its conclusions regarding each one.").

The district court did not discuss the § 3553(a) factors at Sainz-Preciado's sentencing hearing. Nonetheless, the reasons that the court gave in support of its sentencing decision "reflect consideration of the types of factors identified in section 3553(a)." *Laufle*, 433 F.3d at 987. The court rejected defense counsel's argument that Sainz-Preciado was merely the pawn of drug lord Victor Ley, concluding instead that Sainz-Preciado knowingly accepted the risks and monetary benefits of dealing in large quantities of cocaine. *See* 18 U.S.C. § 3553(a)(1) (directing sentencing courts to consider "the nature and circumstances of the offense"). The court also seriously considered the possibility of choosing a below-Guidelines sentence based on Sainz-Preciado's lack of criminal history. *See id.* ("the history and characteristics of the defendant"). Ultimately, however, the court felt that it could not overlook Sainz-Preciado's "continuing effort to peddle large amounts of poison for large amounts of money." *See id.* § 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense"); *id.* § 3553(a)(2)(C) (the need for the sentence "to protect the public from further crimes of the defendant").

Because the court's stated reasons for choosing Sainz-Preciado's sentence reflect a meaningful consideration of the § 3553(a) factors, the sentence is reasonable notwithstanding the court's failure to explicitly discuss those factors. That is especially true since the 262-month sentence selected by the court was at the low end of Sainz-

Preciado's 262-327 month advisory Guidelines range; sentences that fall within the Guidelines range receive an appellate presumption of reasonableness. *Laufle*, 433 F.3d at 987. Sainz-Preciado has not rebutted this presumption by pointing to specific, substantial sentencing arguments that the district court failed to address, and he cannot rely on the simple declaration that "the court did not address any of the § 3553(a) factors." *Martinez*, 520 F.3d at 753.

## Conclusion

For the foregoing reasons, we AFFIRM Sainz-Preciado's sentence.