NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 2, 2010
Decided June 29, 2010

**Before**

DIANE P. WOOD, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 09-2260

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee*, | Court for the Northern District |
| | of Illinois, Eastern Division. |
| *v.* | |
| | No. 06 CR 684 |
| SAUNDRA FALLS, | |
| *Defendant-Appellant*. | Blanche M. Manning, *Judge*. |

**O R D E R**

Saundra Falls participated in an extensive drug-dealing operation affiliated with the Mickey Cobras street gang. The group operated out of the Dearborn Homes housing projects in Chicago; it sold a particularly powerful type of heroin mixed with fentanyl. Falls

was indicted for her role in the conspiracy on September 20, 2006. After efforts to cooperate with the prosecutors fell flat, she entered a blind plea of guilty on September 12, 2008. On appeal, she argues only that the district court erred by giving her an aggravating-role adjustment under U.S.S.G. § 3B1.1, for being a manager or supervisor. The district court's conclusion, however, was supported by the evidence, and so we affirm the sentence.

**I**

From 1998 to 2006, the Mickey Cobras employed dozens of people to distribute heroin and fentanyl to residents of the Dearborn Homes projects. The gang marketed and sold several different "product lines," each of which had a characteristic mixture of cutting agents and packaging. Co-defendant Larry Smith was a high-ranking member of the gang; he controlled the sale and distribution of two lines, "Drop Dead" and "Lethal Injection." These lines alone grossed between $4,000 and $9,000 a day. At some point Smith substituted enough fentanyl in his product that a number of people died from overdoses. A group of federal and local law enforcement officers raided the Dearborn Homes in June 2006; those raids led eventually to indictments charging 32 people for their roles in the conspiracy. All of the defendants pleaded guilty except for one, who remains a fugitive.

Falls worked directly for Smith. She received from transporters heroin that was packaged and ready for sale, and she then stored that product in one of the group's stash houses – an apartment at the Dearborn Homes leased by another woman. Distributors then picked up the drugs from the stash house and delivered them to the retailers. Later, the distributors would turn their proceeds over to Falls, who then gave the money to Smith's brother Aaron. Smith paid Falls a fixed amount, usually about $100 per day.

Like her co-defendants, Falls pleaded guilty to conspiracy to possess a controlled substance with intent to distribute, see 21 U.S.C. §§ 846, 841(a)(1); she received a sentence of 188 months' imprisonment. That sentence was based on the following calculations under the Sentencing Guidelines. The parties agreed that the proper base offense level was 34. The probation officer then recommended a three-level increase under U.S.S.G. § 3B1.1(b) for Falls's role as a manager or a supervisor. Citing Application Note 2, the officer explained that "Ms. Falls did not organize, lead, manage, or supervise other individuals in the conspiracy; however, she did exercise management responsibility over the property and assets (drugs and drug proceeds) of the criminal organization." The probation officer also recommended a three-level reduction for acceptance of responsibility, see U.S.S.G.

§ 3E1.1, bringing her overall offense level back down to a 34. With a criminal history category of I, this led to an advisory sentencing range of 151 to 188 months.

At sentencing, the government agreed with the probation officer's conclusion that Falls's conduct called for the three-level increase appropriate for a manager or supervisor, based primarily on her control over both the drugs and the money, but also based on the fact that she had "supervisory control over some of the workers." In support of the latter contention, the government pointed to Lukas McGee's testimony that Falls was his supervisor, and to Smith's testimony that he asked Falls to be his "eyes and ears" at the Dearborn Homes and to report on whether his sellers were outside selling drugs. Counsel for Falls objected, insisting that her role was very limited. Citing *United States v. Fones*, 51 F.3d 663 (7th Cir. 1995), counsel asserted that the adjustment under § 3B1.1(b) cannot be applied to a defendant who managed assets unless that defendant also exercised authority over another participant in the conspiracy. Falls, counsel argued, never supervised McGee or anyone else, and thus was not subject to the adjustment. Counsel added that Falls was involved only for a brief time and was, in fact, a relatively minor participant.

The district court decided that the government had the better of the argument. It explained its findings as follows:

> Based upon the fact that co-defendants did actually testify that she received heroin that arrived into the conspiracy and then [doled] it out to the sellers, as I recall, there was an admission by Ms. Falls that she handled the receipts of the drug sales and turned them over to Aaron Smith.
>
> . . . .
>
> . . . . Lukas McGee did testify that she [Falls] was his supervisor. These are some of the things that I indicated earlier. I found his testimony to be credible and consistent. As I've pointed out, she was in the role of apparently making sure workers were there and were not tardy, et cetera. I find based upon everything I've heard throughout this entire case that she was, in fact, in that role, a manager/supervisor role.

Because Falls was a manager, the court also concluded that she was not eligible for a safety-valve reduction. See U.S.S.G. § 5C1.2(a)(4).

## II

Whether a defendant played a supervisory role is a factual determination that this court reviews only for clear error. *United States v. Watts,* 535 F.3d 650, 660 (7th Cir.), *cert. denied,* 129 S.Ct. 475 (2008). Falls takes issue with several of the inferences that the district court drew from the facts. For example, she disagrees with the district court's conclusion that "she admonished or checked up on a tardy worker." Larry Smith testified that he asked Falls to tell him if a particular seller "ain't on his act." Smith explained that he needed Falls to be his "eyes and ears" because he had to stay away from Dearborn Homes because of an outstanding warrant. The district court was of the opinion that if serving as someone's eyes and ears was not a supervisory action, then it was not clear what was. The district court's characterization of Falls's work in passing directives from the boss along to underlings as evidence of supervisory authority was entirely reasonable. See *United States v. Sainz-Preciado,* 566 F.3d 708, 715 (7th Cir. 2009); *United States v. Matthews,* 222 F.3d 305, 308 (7th Cir. 2000).

Falls also takes issue with the district court's finding that she supervised McGee. But McGee testified at the sentencing hearing that Falls "overseen my involvement" and "made sure my job was done." She did this, he said, by collecting the day's proceeds from the safe in the stash house, where McGee had put the money. He testified that Falls told him where the safe was, how to retrieve bundles of heroin, and how to deposit the day's proceeds. After she explained the process, however, he had little communication with her.

In Falls's opinion, McGee's testimony at sentencing was contradicted by his proffer statement to the effect that Nigel McCauley recruited him, trained him, and was his supervisor. In addition, McGee's telephone records shows that during his two-month stint with the conspiracy, he made 1,400 phone calls, of which only eight were to Falls; Falls never called him. But at most, this suggests that there was evidence on both sides of the issue, and it was the district court's job to weigh that evidence and come to a conclusion. We see no clear error in the court's decision.

Finally, Falls argues that the upward adjustment was inappropriate because she did not play a significant role in the enterprise. "The 'central concern' of § 3B1.1 is the defendant's relative responsibility for the commission of the offense." *United States v. Mendoza,* 576 F.3d 711, 717 (7th Cir. 2009) (citation omitted). Falls contends that there is no evidence that she performed any of the usual tasks of a manager, including exercising

decision-making authority, recruiting accomplices, claiming a larger share of the proceeds, or participating in planning or organizing any activities. See U.S.S.G. § 3B1.1 cmt. N.4; *United States v. Mustread,* 42 F.3d 1097, 1104-05 (7th Cir. 1994); *United States v. Brown,* 944 F.2d 1377, 1382 (7th Cir. 1991). But Falls concedes that she occasionally issued directives to other participants. Even if another judge might have come out the other way, there is enough evidence in this record to support the conclusion that this judge drew.

Our last comment relates to the question whether the government had to show that the defendant managed *people,* or if it would be enough for purposes of § 3B1.1 to show that she managed only property. In its presentations to the district court, the government stressed the latter position, even after Falls pointed out that Application Note 2 to § 3B1.1 and *Fones,* 51 F.3d at 668, rules out that approach for post-1993 cases. Falls was correct, but to the extent that the government erred, it had no effect on the ultimate outcome. In fact, the court relied on evidence that Falls was also managing at least one participant (McGee), and that is enough to satisfy Application Note 2 and to show that it was not relying exclusively on her responsibilities with respect to the drugs and money.

### III

Finding no clear error in the district court's decision to increase Falls's offense level by three points for her role as a manager or supervisor, we AFFIRM the judgment of the district court.