In the

# United States Court of Appeals
## for the Seventh Circuit
_____

No. 21-2649

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN M. HENIGAN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 19-cr-10021 — **Joe Billy McDade**, *Judge.*

_____

ARGUED SEPTEMBER 7, 2022 — DECIDED OCTOBER 30, 2024

_____

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN, *Circuit Judges*.

SYKES, *Chief Judge*. For years John Henigan bought large quantities of heroin and cocaine in Chicago and sold the drugs to his retail customers in and around Peoria, Illinois. An investigation led to a series of controlled buys, which in turn led to his indictment on three counts of heroin distribution. He pleaded guilty to all counts. As relevant conduct under the Sentencing Guidelines, the presentence report

included information about three overdose deaths linked to heroin Henigan supplied.

Henigan objected, denying any connection to the deaths. Based on his denial of relevant conduct, the probation officer recommended against applying the offense-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. After an evidentiary hearing, the district judge found insufficient evidence to trace two of the overdose deaths to heroin Henigan supplied. But the judge found him responsible for the remaining fatality—the overdose death of Seth Rhodes. Still, the judge credited him for accepting responsibility and reduced his offense level by two levels under § 3E1.1(a). The prosecutor, however, declined to move for the additional one-level reduction under § 3E1.1(b) because Henigan had falsely denied relevant conduct. The judge imposed an above-guidelines sentence based on Henigan's involvement in Rhodes's death.

Henigan challenges the prosecutor's refusal to move for the extra acceptance-of-responsibility credit. He claims that a 2013 amendment to the commentary to § 3E1.1 prohibits the government from withholding the motion based on the defendant's sentencing objections. We recently addressed and rejected this argument in *United States v. Orona*, No. 21-1734, ___ F.4th ___, 2024 WL 4355402 (7th Cir. Oct. 1, 2024). Henigan also challenges the judge's factual findings regarding Rhodes's death. We find no clear error. Finally, Henigan contends that his sentence is procedurally and substantively flawed because the judge did not accept his argument for a lower sentence to compensate for the government's refusal to file a § 3E1.1(b) motion. This argument was waived; it is also meritless. We affirm.

## I. Background

Between 2015 and June 2019, Henigan made weekly trips to Chicago to buy large quantities of heroin and cocaine to sell to his customers in Peoria and other locations in central Illinois. After a string of heroin-overdose deaths in the area, local law enforcement launched an investigation. Informants identified Henigan as the victims' heroin source. With the assistance of informants, officers conducted three controlled heroin buys and arrested Henigan after the third. He gave a detailed confession, admitting that since 2015 he had traveled to Chicago on a weekly basis to buy supplies of heroin and cocaine, returning to the Peoria area where he cut and sold the drugs to numerous customers in several cities in the central part of the state. He told the police that his earnings from his drug business ranged from a low of $600 on a bad day to as much as $1,700 on a good day.

The investigation was handed off to federal authorities, and the government obtained an indictment charging Henigan with three counts of heroin distribution in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), one count for each controlled buy. He eventually pleaded guilty to all three counts. As relevant conduct, the presentence report included information about three of Henigan's customers who fatally overdosed on heroin he supplied. Specifically, the report described the overdose deaths of Seth Rhodes, who died on April 30, 2016; Joseph Mortimeyer, who was found dead on September 24, 2016; and Jennifer Adolphson, who overdosed on May 12, 2017, and died 12 days later.

Henigan objected and denied any connection to the three overdose fatalities. He said he did not know Rhodes or Mortimeyer and never sold drugs to either of them. As for

Adolphson, Henigan claimed that he last sold drugs to her in March 2017, so he couldn't be responsible for her overdose death in May of that year. The probation officer considered these objections frivolous based on Henigan's earlier admissions. And because he had falsely denied relevant conduct, the final presentence report recommended against reducing his offense level under § 3E1.1 for acceptance of responsibility. The presentence report also noted that an "upward departure" from the advisory guidelines imprisonment range might be appropriate under § 5K2.1 because Henigan's criminal conduct had resulted in a death.

The judge held a two-day evidentiary hearing to address Henigan's objections. The government presented evidence about the circumstances surrounding all three overdose deaths. Only Seth Rhodes's death is at issue here, so we limit our account accordingly.

To prove that Henigan was the source of the heroin that caused Rhodes's death, the government presented testimony from the case agent and Daniel O'Brien, one of Henigan's regular crack-cocaine customers. O'Brien testified that he frequently purchased crack cocaine from Henigan and first met Seth Rhodes when they shared a cell in the Tazewell County Jail. Rhodes was addicted to heroin and asked O'Brien if he knew a heroin source in the area because his own sources had cut him off. O'Brien was aware that Henigan sold heroin as well as crack; he testified that he took Rhodes to buy heroin from Henigan four or five times. The last time he did so was on April 29, 2016, when he and Rhodes arranged to meet Henigan to buy drugs—crack for himself and heroin and crack for Rhodes.

O'Brien testified that he and Rhodes met at around 4:30 p.m. on April 29 and drove to a Dunkin' Donuts parking lot, the designated place for the transaction with Henigan. O'Brien brought cash for his crack purchase; Rhodes brought cash to cover his purchase of both heroin and crack. When they arrived at the meeting place, O'Brien got out of the car, entered Henigan's vehicle, paid for the crack and heroin, and returned with the drugs to the car where Rhodes was waiting. O'Brien and Rhodes then left the Dunkin' Donuts parking lot and drove to another location where they smoked crack together. Afterward, they parted company and Rhodes left "with his heroin in his pocket."

Later that night Rhodes messaged O'Brien on Facebook that the heroin was "really good stuff." At around 7:30 p.m. the next day, Rhodes's mother and stepfather found him dead in his bedroom in the basement of their home. They called 911, and Seth's mother told the responding officers that she had last spoken with her son around 11:30 p.m. the night before. His stepfather said he heard Seth moving around in the home in the overnight hours between 1:00 and 3:00 a.m. They told the officers that Seth was a heroin addict and typically stayed up all night and slept most of the day. When they checked on him at around 7:30 p.m. on April 30, he was dead and cold to the touch.

In Rhodes's bedroom officers discovered various items of drug paraphernalia, small amounts of drug residue, 0.2 grams of heroin, and synthetic marijuana. An autopsy confirmed that Rhodes died from heroin and cocaine intoxication.

In a written order following the hearing, the judge found that the government had not established that Henigan supplied the drugs that caused the deaths of Mortimeyer and

Adolphson. As for Rhodes, the judge found the evidence sufficient to establish that Henigan supplied the heroin that contributed to Rhodes's overdose death. But the judge ultimately held that the government had not shown that "the heroin by itself was the 'but-for' cause of death." Accordingly, the judge disagreed with the probation officer's recommendation to deny acceptance-of-responsibility credit. He indicated instead that he would apply the two-level offense-level reduction under § 3E1.1(a).

The government moved for reconsideration on the issue of Rhodes's death. The judge reconsidered and reversed his causation finding. He reiterated his previous finding that Henigan had furnished the heroin that contributed to Rhodes's death. This time, however, he agreed with the government that Rhodes's death should be counted as relevant conduct because Henigan supplied both the heroin *and* the cocaine that combined to cause the overdose death.

For reasons that are not entirely clear, the judge's reconsideration decision did not prompt a change in his earlier ruling on credit for acceptance of responsibility. After finding Henigan responsible for Rhodes's death, the judge indicated that he would not deviate from his prior plan to award the two-level reduction under § 3E1.1(a). He did say, however, that he would consider Henigan's culpability for Rhodes's overdose death when making his ultimate sentencing decision.

At sentencing the judge followed through on his plan to credit Henigan with acceptance of responsibility: he reduced Henigan's offense level by two levels under § 3E1.1(a). A third offense-level reduction is possible under § 3E1.1(b), but it requires a motion from the government. The prosecutor

declined to move for the extra one-point reduction under
§ 3E1.1(b) based on Henigan's false denial of relevant con-
duct. The judge calculated an advisory guidelines imprison-
ment range of 92 to 115 months.

Henigan's attorney asked the judge "to consider taking
eight months off" her client's sentence because the govern-
ment did not "give him that third point" for acceptance of re-
sponsibility. She conceded, however, that "it's up to the
government" to decide whether to move for the additional of-
fense-level reduction under § 3E1.1(b). After the attorneys
completed their sentencing arguments, Henigan read from a
letter he had written to the court, and the judge then moved
to his evaluation of the nature of the crimes and Henigan's
history, as required by 18 U.S.C. § 3553(a). The judge at length
addressed Henigan's background and characteristics and de-
scribed the seriousness of his drug-trafficking activity and its
effect on the community. He emphasized that Henigan was
"selling an illegal product that kills people." At the end of this
explanation, the judge imposed an above-guidelines sentence
of 158 months in prison.

With a prompt from the prosecutor, the judge confirmed
that the sentence "included a variance" of 43 months under
U.S.S.G. § 5K2.1 because Henigan's criminal conduct had re-
sulted in a death. The judge then asked Henigan's attorney if
he had addressed all arguments in mitigation. She responded
by suggesting that the judge might not have been entirely
clear about whether he had found Henigan responsible for
just one overdose death or more. The judge clarified that he
found Henigan responsible for just Rhodes's death, not the
others, as he had explained in his previous order. Before

concluding, the judge invited further questions; the attorneys had none.

## II. Discussion

Henigan's first argument on appeal is that the government unlawfully withheld the motion for the extra offense-level reduction for acceptance of responsibility under § 3E1.1(b). This claim is new on appeal; Henigan did not object to the government's decision below. Quite the contrary. As noted above, Henigan's attorney conceded that the third acceptance-of-responsibility point is "up to the government."

That looks like a waiver, but the government has not pressed the point. Even if not waived, the argument was at a minimum forfeited—as the government maintains—so our review is constrained by the plain-error standard. Ultimately, however, the standard of review does not matter. Our recent decision in *Orona* conclusively resolves the issue against Henigan's position.

The extra acceptance-of-responsibility credit is expressly conditioned on a motion from the government stating that the defendant has

> assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, *thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.*

U.S.S.G. § 3E1.1(b) (emphasis added). Like Lafiamma Orona before him, Henigan argues that Amendment 775—the Sentencing Commission's November 2013 amendment to the commentary to § 3E1.1—limited the government's discretion

under subsection (b) to considerations related to saving *trial* resources.

More specifically, Henigan argues that Amendment 775 had the effect of barring the government from withholding a § 3E1.1(b) motion based on considerations related to *sentencing* resources. In the typical case, the issue arises when the prosecutor refuses to move for the § 3E1.1(b) reduction based on the defendant's false objection to relevant conduct or some other guidelines factor, requiring the government and the court to allocate resources to addressing and resolving the objection. That's the context in which the issue arises here.

Our recent decision in *Orona* addressed and rejected Henigan's argument. *Orona* reaffirmed earlier circuit precedent holding that the government's § 3E1.1(b) discretion is very broad and includes the discretion to withhold a motion for the extra offense-level reduction based on a defendant's false or frivolous objection to relevant conduct or some other guidelines sentencing factor. *Orona*, 2024 WL 4355402, at *5–9 (reaffirming *United States v. Nurek*, 578 F.3d 618 (7th Cir. 2009), and *United States v. Sainz-Preciado*, 566 F.3d 708 (7th Cir. 2009)). We addressed the history of § 3E1.1(b) and Amendment 775 at length in *Orona* and concluded that the amendment did not abrogate our circuit precedent. *Id.* at *8–9. There's no need to repeat our full reasoning here. Henigan's argument is foreclosed by *Orona*.

Henigan next challenges the judge's ruling finding him responsible for Rhodes's death, which formed the basis for the judge's decision to impose an above-guidelines sentence. Factual findings at sentencing are reviewed for clear error. *United States v. Ranjel*, 872 F.3d 815, 818 (7th Cir. 2017). Under this deferential standard, we will reverse "only if after reviewing

the entire record, we are left with the firm and definite conviction that a mistake has been made." *Id.* (quotation marks omitted). When "two possible conclusions can be drawn from the evidence, then the choice between them cannot be clearly erroneous." *United States v. Major*, 33 F.4th 370, 379 (7th Cir. 2022) (quotation marks omitted).

Henigan argues that the only reasonable inference from the circumstances of Rhodes's death is that he overdosed on drugs obtained from some other source. As Henigan views the evidence, the timeline simply doesn't add up. Recall the particulars of O'Brien's testimony: he and Rhodes met at 4:30 p.m. on April 29, drove to the Dunkin' Donuts parking lot where they bought crack and heroin from Henigan, then drove to another location where they smoked crack together. Afterward, Rhodes left with his heroin. Sometime later that night, Rhodes messaged O'Brien that the heroin was "really good stuff." Rhodes's mother saw him alive at around 11:30 p.m., and his stepfather heard him moving around the house during the overnight hours, perhaps as late as 3:00 a.m. More than 16 hours later, at around 7:30 p.m. on April 30, Rhodes's mother and stepfather found him dead in his bedroom, cold to the touch. This gap in time, Henigan insists, leads to an inescapable conclusion: Rhodes obtained more heroin from another dealer sometime on April 30, and the other dealer's drugs caused his death.

The gap in time leaves room for that theory, but it's highly speculative; no other evidence supports it. Indeed, O'Brien's testimony undermines it: he testified that Rhodes had no other sources of heroin, which is why he connected him with Henigan as his heroin source.

Viewed as a whole, the evidence supports the judge's finding that Rhodes's death, which occurred at an unknown time sometime after 3 a.m. on April 30, was caused by the drugs he obtained from Henigan late in the afternoon on April 29. Henigan's time-gap theory does "not overcome the bulk of the evidence" pointing to Henigan as the source of the drugs that caused Rhodes's death. *United States v. Garcia*, 948 F.3d 789, 807 (7th Cir. 2020). We find no clear error.

As his final claim of error, Henigan challenges the judge's failure to accept his suggestion to "tak[e] eight months off" the sentence to account for the government's refusal to move for the extra offense-level reduction under § 3E1.1(b). He frames this as both a procedural and a substantive challenge. If the former, we review the claim de novo. *United States v. Kuczora*, 910 F.3d 904, 907 (7th Cir. 2018). If the latter, we review the claim for abuse of discretion. *Id.* at 909.

Beginning with the procedural framing, Henigan faults the judge for not explicitly addressing his suggestion to shave eight months off the sentence to compensate for the government's withholding of the § 3E1.1(b) motion. This argument is waived. At the end of the sentencing hearing, the judge asked whether he had adequately addressed Henigan's main arguments in mitigation. In reply, Henigan's attorney asked the judge to clarify his ruling on the overdose deaths—specifically, whether he had found Henigan responsible for Rhodes death alone or also the two others identified in the presentence report. She did *not* ask the judge to explain why he had rejected the request to reduce the sentence based on the government's § 3E1.1(b) decision.

So the judge expressly invited Henigan to identify any mitigation arguments that were overlooked or needed

clarification. Though his counsel raised another issue, she did not ask the judge to explain his reason for rejecting the argument about an eight-month sentence reduction. Accordingly, Henigan cannot now object to the lack of explanation. *United States v. Brown*, 932 F.3d 1011, 1019–20 (7th Cir. 2019). When a defendant "passe[s] up the chance for elaboration," he cannot argue on appeal "that the court's explanation was inadequate." *United States v. Maxfield*, 812 F.3d 1127, 1130 (7th Cir. 2016).

Alternatively, Henigan argues that his sentence is substantively unreasonable because the judge did not reduce it by an amount of time commensurate with the loss of the extra credit for acceptance of responsibility under § 3E1.1(b). Waiver applies here too, but the substantive variant of this claim is also meritless. As we've explained, in *Orona* we reaffirmed our circuit precedent that the government has broad discretion under § 3E1.1(b) and may withhold the motion for the extra acceptance-of-responsibility point based on a defendant's false or frivolous sentencing objections. 2024 WL 4355402, at *5–9. The government's exercise of its § 3E1.1(b) discretion has no bearing on the reasonableness of the sentence the judge imposed.

AFFIRMED