In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-2118

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES C. HOWELL,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 05-CR-40113—**Joe Billy McDade**, *Judge.*

_____

ARGUED FEBRUARY 21, 2008—DECIDED MAY 29, 2008

_____

Before FLAUM, RIPPLE, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Charles Howell lived in Seattle, Washington and mailed drugs to the Midwest. He received assistance in this process from at least two individuals. Eventually, he was caught, and charged with possession with intent to distribute marijuana and ecstasy and conspiring to do the same. The district court increased his sentence for serving as a manager or supervisor in the context of the criminal activity, and we affirm.

**Background**

Early in 2003, Howell obtained a post office box at a mail service business called Mail Services and More. He used that service to mail packages of marijuana to Tennessee. Howell established a relationship with the sole Mail Services employee, Ben Guevarra. Every time Howell shipped a package from that location (and he did so over 100 times during the course of the conspiracy), he paid Guevarra $50 to $200 in cash on the side. Usually, Howell would bring the packages to the center himself. On some occasions, Howell would bring the package, give Guevarra the money, and ask him to fill out the packing slip and send it for him. The money for the drugs would often be sent back to the same location, so Howell would go to the center to pick up the cash. Guevarra would usually call Howell whenever a package arrived for him; this was not done for other customers. A few times, Guevarra kept the business open after closing at Howell's request.

At some point in 2002, Howell met Chad Scott, who also lived in Seattle. Scott started buying marijuana from Howell, and the two also appeared to become good friends. Scott learned that Howell shipped marijuana to Tennessee, and that he was about to take a trip there. He asked Howell if he could accompany him on this trip. At first, Howell refused, but then he changed his mind. He did not specify why he wanted Scott to come along, but Scott's understanding was that he was to serve as "the muscle to keep an eye on things." Scott was a significantly bigger and more intimidating figure than Howell. Howell paid all of Scott's expenses (e.g., plane ticket, meals) for the trip, which lasted a little over a week. They stayed in an apartment that Howell rented. Scott went

along when Howell was conducting drug business, but he was never in the room when money was being counted or drugs were exchanged. At the end of the trip, Howell gave Scott $400 to $500.

In December 2002, Scott communicated to Howell that he needed money. It just so happened that Howell had given an individual in Memphis, Tennessee two pounds of marijuana in exchange for a Honda Prelude. Howell asked Scott and an unknown Asian male to travel to Memphis via plane and drive the vehicle from Memphis to Seattle. The two were to be given cash for their efforts. While in Memphis, Howell also wanted Scott and the unidentified male to pick up a dog that belonged to his half-brother, John Goode, and $4,000 from a female that owed him the money as part of a marijuana deal. Scott and his partner assented, and they eventually returned with the vehicle, the drug proceeds, and the dog.

Scott went down to Tennessee on a third occasion, this time with Howell, and stayed at a hotel. As was the case in their previous visit, Howell paid all expenses and did not explain why he wanted Scott to accompany him. Scott, again, assumed it was to protect Howell.[1] Significantly, when the two were flying back, Howell gave Scott a stack of cash (presumably drug proceeds) held together with a rubber band and asked him to carry it through

---

[1] In their two trips to Tennessee together where Scott was ostensibly providing bodyguard-like services, he never actually actively protected Howell by striking anyone. Once, Howell and another individual started raising their voices, and Scott told the latter that they did not want any trouble. The man then backed off.

airport security.[2] Agreeing to the task, Scott made his way through security without any problems. Once Howell cleared security, Scott gave him the money, and he then gave Scott a few hundred dollars. They parted ways at the airport, as Howell returned to Seattle and Scott flew to San Diego to visit his child and the child's mother.

At the end of 2003, Scott moved to Arizona, but he and Howell kept their relationship going. He would give Howell money, and Howell would then send him marijuana. During this period of time, Scott came into a substantial sum of money through a robbery. He subsequently sent several thousand dollars to Howell so that he would send three pounds of marijuana to Scott's uncle in the Quad Cities.[3] The thought was that the drugs could be sold at a higher price there as opposed to Arizona. This arrangement—where Scott would send money to Howell, and Howell would send drugs to Scott's uncle in the Quad Cities—continued for some time. Later, Howell introduced Scott to Guevarra, and told him to let Scott ship a package. Howell instructed Scott to pay Guevarra $100 to $150 extra per package. At this point, the nature of the arrangement changed, and Scott would obtain drugs from Howell and would then ship them himself to the Quad Cities through Mail Services and More. This continued for eight months, and during this time, Howell also started selling MDMA ("ecstasy") to

[2] Howell's half-brother previously had nearly $25,000 in cash seized at the same airport by law enforcement agents.

[3] The term is actually a bit of a misnomer, as it refers to a group of five cities in Iowa and Illinois that border the Mississippi River. *See* Quad Cities, WIKIPEDIA, May 1, 2008, http://en.wikipedia.org/wiki/Quad_Cities.

Scott. Quantities ranged from 200 to 1000 pills per ship-
ment. Scott then stopped buying ecstasy from Howell
and instead bought directly from Howell's dealer.

In almost all instances, Scott would pay Howell up front
before Howell would send him drugs. And the two never
shared profits as a part of the Quad Cities operation. In
total, about 25 to 30 of these packages were sent to the
Quad Cities. Eventually, authorities intercepted one of
these packages, and the arrangement fell apart.

On May 17, 2006, the grand jury returned a super-
seding indictment charging Howell with conspiracy to
distribute both ecstasy and 100 kilograms or more of
marijuana, and possession with intent to distribute the
same substances. Howell pled guilty to the charges. The
pre-sentence report recommended adding a four point
enhancement to Howell's sentence for serving as an
organizer or leader of the criminal activity. The district
court stated that it was not convinced that Howell as an
organizer or leader, but thought instead that his role
was that of a manager or supervisor. As a result, Howell
was given a three level enhancement under § 3B1.1(b) of
the U.S. Sentencing Guidelines. This resulted in an advi-
sory imprisonment range of 235 to 293 months, which
was about 80 more months than would have been the
case absent the enhancement. The district court subse-
quently sentenced Howell to 235 months' imprisonment.
This appeal followed.

### Discussion

The sole issue on appeal is whether the district court
committed error in concluding that Howell managed or
supervised at least one other participant in the drug

distribution conspiracy. We review a district court's determination as to whether a defendant exercised a managerial role in the charged offense for clear error. *United States v. Hall*, 101 F.3d 1174, 1176 (7th Cir. 1996). The sentencing guidelines provide a three level increase for a defendant who was a manager or supervisor of the charged activity. U.S.S.G. § 3B1.1(b).[4] While the guidelines do not define the terms "manager" or "supervisor," the application note to this section suggests that the following seven factors be considered when deciding whether to enhance a defendant's offense level: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning and organizing the offense; (6) the nature and scope of the illegal activity; (7) the degree of control and authority exercised over others. *Id.*, comment. (n.4). We have noted that these factors are to be used to distinguish leadership from management, but have found that they are still relevant in ascertaining whether an individual had a supervisory role at all. *United States v. Brown*, 944 F.2d 1377, 1380 n.1 (7th Cir. 1991).

---

[4] Section 3B1.1 specifically states:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

Our case law indicates that certain of the seven factors listed in the application note to § 3B1.1 are more significant than others. Howell places great weight on our decision in *United States v. Brown*, where we held that the defendant's status as a middleman or distributor of marijuana did not, by itself, support a finding that he was a "supervisor" or "leader" subject to the increase in his base offense level. 944 F.2d at 1381. The rationale for this conclusion, according to Howell, is that a distributor or middleman does not truly exercise control over another individual. But we later clarified our holding in *Brown* in *United States v. Skinner*, 986 F.2d 1091 (7th Cir. 1993), where we stated that

> The holding in *Brown* focused on one of the [application note] factors—control and authority. Our focus on this one factor, however, was not meant to obscure that the "central concern" of section 3B1.1, is relative responsibility for the offense. While we referred to the element of control as "*an* important and recurring factor," . . . we hardly established it as the *sine qua non* of liability for enhancement under [the section].

*Id*. at 1097.

And in *Brown* itself, we explicitly noted that "[m]iddlemen are not, of course, immune from application of § 3B1.1." 944 F.2d at 1381. So while we examine all of the factors, we emphasize both relative responsibility and control over other participants, and recognize that middleman status is not necessarily inconsistent with being a manager or supervisor.

Howell contends that he did not have a manager or supervisor relationship with Scott: he was his supplier, and his friend. When Scott bought drugs, he almost always

paid first. And when he bought the drugs to send elsewhere (e.g., Quad Cities), he decided when and where they should be shipped, and how much should be shipped. Beyond supplying the drugs to Scott, Howell was not involved in the Quad Cities operation. Other than Scott, he did not know any of the other participants. Plus, there was no profit-sharing whatsoever. Further, Scott did not purchase exclusively from Howell—he eventually went to Howell's supplier for ecstasy, for instance. In regards to the various trips to Tennessee, Scott insists that he was merely going along as a friend, nothing more. Howell also asserts that he had no authority over Guevarra, who shipped packages as a part of his role as an employee of a mail company. With respect to the payments, he claims that Guevarra was a friend, and that he was simply "tipping" him.

The government paints a very different picture. In its view, Howell was superior to Scott and Guevarra—and therefore served as a manager or supervisor—in that he controlled the supply, delivery, and money. Scott, for example, provided muscle to Howell on at least two trips to Tennessee. And he not only paid Scott's expenses, which would be consistent with his "we were just friends" theory, but he also gave him *additional* cash at the end of their trips, which connotes more of an employer/employee relationship. Even more striking is the airport incident, where Scott risked getting caught by airport security with drug proceeds all in an effort to protect Howell. Was this simply an act of friendship, or devotion? Perhaps in part. But, again, Scott was paid for taking this risk. Additionally, in a fourth instance, Scott was paid in excess of his expenses for flying to Tennessee to pick up Howell's car, dog, and drug money.

In regards to Guevarra, it is true that he was simply doing his job by shipping packages, but he took a big risk in helping to ship packages that he knew or suspected to contain illegal drugs. He was compensated for this risk, and for staying quiet. There is nothing in the record that reflects that other Mail Services and More customers who were "friendly" with Guevarra were leaving him "tips" for sending packages. Nor is there any indication that Guevarra was leaving the store open beyond regular hours, or packaging and filling out mailing labels, for other friendly but non-tipping customers. The government also submits that Howell exerted his influence over the two men by waiting for quite some time before introducing them to each other. Once he did make the introduction, he instructed Scott on how much to pay Guevarra. Overall, apart from his influence over Scott and Guevarra, Howell played the biggest role in this scheme: he acquired the drugs, arranged for their sale to Scott and its shipment to Tennessee, paid Guevarra, and planned trips to Tennessee with others.

For purposes of ascertaining whether the enhancement should apply to Howell's sentence, it is useful to segment the criminal activity into two parts: the Tennessee operation, and the Quad Cities operation. With respect to the latter, there is little reason to believe that Howell played a managerial role. Simply put, he was acting as a dealer—he took money from Scott and gave him drugs in return. It was Scott who would then set the price and work out who he would sell to, how he would sell it, and when he would do it. In fact, he even decided who he would buy from: he went over Howell's head and went straight to his dealer for ecstasy. But when we turn our attention to the Tennessee operation, Howell and the

others do not appear to be co-equal. Guevarra was directed to take risks with his job, and he got paid to do it. More importantly, Scott openly admitted to serving as a de facto bodyguard, currency courier, and errand boy, and he too was compensated—above and beyond his expenses—for his efforts. The Tennessee drug transactions were all structured by Howell, indicating greater culpability, and Scott played an accompanying role. Howell can continue to assert that he and Scott, and he and Guevarra, were just friends, but the fact of the matter is that you can supervise and manage individuals even if they happen to be your friends. The nature of their interaction vis-a-vis the Tennessee operation, including the payments, evinces a managerial element layered onto, and not inconsistent with, what may have been a sincere friendship.

## Conclusion

For the foregoing reasons, we AFFIRM Howell's sentence.