In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2403

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE MEDINA MENDOZA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 3:06-cr-50070-1—**Frederick J. Kapala**, *Judge.*

ARGUED MAY 8, 2009—DECIDED AUGUST 12, 2009

Before CUDAHY, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Jose Medina Mendoza was charged along with Jose Luis Rodriguez and Samuel Perez with a cocaine conspiracy. Perez and Rodriguez also were charged with related drug offenses. They pled guilty to the conspiracy charge, but Mendoza took his chances with a jury and was convicted. The district court imposed a sentence of 120 months, near the upper end of the advisory Guidelines range of 97 to 121 months.

Mendoza challenges only his sentence on appeal, and we affirm.

## I. Background

In 2006, Drug Enforcement Agency Special Agent Robert Lukens was assigned to the Metropolitan Enforcement Team and deployed to Rockford, Illinois. Lukens was working in an undercover capacity and, in that capacity, he made three controlled purchases of cocaine from Samuel Perez on September 19 and 28 and October 11. Lukens bought approximately one ounce of cocaine in the first two transactions. On the 11th, Lukens bought four ounces. At the end of that transaction, Lukens inquired about purchasing a larger amount of cocaine—a quarter or a half kilogram. Perez responded, "Let me find out, and I'll let you know." Lukens understood Perez to mean that Perez needed to check with his source of supply.

On November 2, 2006, Lukens called Perez around 12:23 p.m. and asked if he could buy a half kilogram of cocaine for $9,000. Perez said that he would have to "talk to his guy" or "his friend," which Lukens understood meant that Perez had to talk to his source. Lukens and Perez agreed to talk again later that day after Perez had talked to his friend.

Lukens and Perez had telephone conversations at 1:35 p.m. and 2:18 p.m. that afternoon. During the first of these conversations, Perez told Lukens that he needed a bit of time to obtain the half kilogram of cocaine and that

he would call Lukens back. Lukens understood Perez to mean that he would have to talk to his source. Lukens and Perez discussed $9,000 for cheaper cocaine—cocaine that was diluted and cut—and $10,500 for "the good stuff"—higher quality cocaine. Perez said he could give Lukens the "same kind" (quality) of cocaine he sold him the last time, but it would take time for Perez to get the "good stuff." During the second call, Perez reported that he couldn't get the $9,000 half kilogram that day because "[t]he other guy, he's not ready," but Perez could get the $10,500 half kilogram right away—in about one hour. Lukens agreed to buy the cocaine that was available that day. He told Perez that "[n]ext time I need a money break," to which Perez responded, "Alright . . . we can talk in person later." Lukens and Perez arranged for the transaction to take place later that day. During the 2:18 p.m. call, Perez also was talking to another man who said he had to go and if he didn't bring "the caddie" that day, he'd bring it tomorrow.

Lukens and Perez met later that afternoon. Perez delivered the cocaine to Lukens and was promptly arrested. Lukens interviewed Perez after his arrest. During the interview, the cell phone that had been taken from Perez repeatedly rang and the display on the phone said "Chico Che." Lukens testified that this happened approximately half a dozen times.

Perez consented to a search of his apartment, so Lukens and other officers went to Perez's apartment. Mendoza opened the door and said that he was "Chico Che." Inside Perez's apartment, the officers found two presses used to

"re-press" cocaine into kilogram bricks after the cocaine had been mixed with cutting agents. Both presses had powder residue on them which later tested positive for the probable presence of cocaine. The officers also found Mendoza's cell phone. Its call log showed several outgoing calls to Perez. Mendoza was arrested.

Mendoza, Perez, and Rodriguez were later charged with conspiracy to possess with intent to distribute and to distribute more than 500 grams of mixtures containing cocaine. Perez and Rodriguez also were charged with related drug offenses. Perez and Rodriguez pled guilty to the conspiracy charge. Perez was sentenced in September 2007 to 72 months' imprisonment. Rodriguez failed to surrender as required and a warrant was issued for his arrest. Rodriguez was sentenced in abstentia in December 2007 to 66 months' imprisonment. Mendoza was tried by a jury in February 2008.

Perez testified at Mendoza's trial. Perez stated that on November 2, 2006, when he told Lukens that he needed to "ask somebody" for the half kilogram of cocaine, he didn't have the cocaine himself and he intended to ask Mendoza. Perez testified that after he talked with Lukens, he and Mendoza went to Rodriguez's house to get the half kilogram of cocaine. Mendoza, Perez, and Rodriguez cut the half kilogram off a kilogram piece of cocaine. Perez was given the half kilogram. He didn't pay for the cocaine at that point. According to Perez, he was supposed to sell the half kilogram to the "white guy"—Lukens—and then return to Rodriguez's house and give the money to Mendoza and Rodriguez.

Perez's trial testimony is supported by factual state-
ments in his written plea agreement and his statements
under oath at his change of plea hearing. Perez admitted
in his plea agreement that he conspired with Mendoza
and Rodriguez to possess with intent to distribute and to
distribute more than 500 grams of cocaine. He also ad-
mitted that Mendoza—whom he knew by his nickname
"Chico Che"—was his source of supply for the cocaine
for the November 2 delivery. And Perez admitted that
he intended to sell the cocaine he received from Mendoza
"on credit" to Lukens and provide Mendoza with the
money for the cocaine, less Perez's profit. At his change
of plea hearing, Perez testified that the facts set forth in
his plea agreement were true, thus identifying Mendoza
as the source of supply for the November 2 transaction.

Jaime Rodriguez, Rodriguez's wife, testified at
Mendoza's trial. She stated that in November 2006,
she lived with her husband and children at 510 Gregory
Street. She knew Mendoza and knew that he used the
name "Chico Che." Jaime saw Mendoza at her house
once, on November 2, the same day law enforcement
officers searched her house and found one and a half
kilograms of cocaine. When she arrived home from
work at 5:15 p.m. that day, Chico Che and her husband
were at the house. She saw Mendoza on his phone and
heard him tell Rodriguez that he was trying to call
"Charchai"—Perez. Jaime heard Mendoza tell Rodriguez
that Perez robbed him of his dope. Mendoza asked Rodri-
guez for a ride, and the two left the house together.

Sara Hernandez, who had dated Perez, testified at
Mendoza's trial as well. According to Hernandez, on

November 2, she tried to call Perez on his cell phone several times, but was unable to reach him. Around 11:00 p.m., Sara went to Perez's apartment where she talked to Mendoza. She told Mendoza that she'd been trying to call Perez, but he never answered the phone. Sara asked Mendoza if he knew what was going on, and Mendoza responded that he didn't know where Perez was. Mendoza added that he was scared that Perez had been pulled over because he hadn't answered his phone or returned Mendoza's calls. Mendoza also stated that he was scared that Perez was playing games with him. Sara asked him, "What kind of games?" and Mendoza answered, "To run away with my money."

According to the Presentence Investigation Report (PSR), in a post-arrest interview given on November 2, 2006, Perez told police officers that he knew Mendoza and knew that he sold "a lot" of cocaine that he brought from Mexico. The PSR indicated that Perez said in the interview that he ran into "Chico Che" at a gas station earlier that morning and asked Mendoza if he would get Perez a half kilogram of cocaine. Mendoza initially declined, but then agreed. According to Perez, Mendoza directed him to go to 510 Gregory Street in Rockford, where Mendoza would wait with Rodriguez for Perez. Perez did as he was instructed. When Perez arrived at Rodriguez's house, Mendoza, Rodriguez and Perez went into the basement. They cut and weighed a half kilogram of cocaine and agreed that Perez would contact Mendoza when he had the money. Perez told the detectives that he agreed to give Mendoza $9,000 for the half kilogram of cocaine.

In later pre-trial interviews Perez's story changed. On January 24, 2008, he first claimed that Mendoza was the source for the cocaine for all four transactions with Lukens. Perez later contradicted himself and claimed that "Pelon" was his source for the first three transactions, but still maintained that Mendoza was the source for the half kilogram he sold Lukens on November 2 and the one and one-half kilograms found at Rodriguez's house. At a previous time, Perez had claimed Pelon delivered the cocaine to him on Mendoza's behalf. However, in a January 30, 2008 pre-trial interview, Perez stated that the half kilogram as well as the cocaine found in Rodriguez's house belonged to Rodriguez, not Mendoza. Perez claimed he had said Mendoza was his source because a detective had told him that was what the detective wanted him to say and if Perez did so, the detective would release him from custody.

The PSR indicates that Rodriguez was interviewed on November 3, 2006. In his post-arrest statement, Rodriguez said that Mendoza arrived from Mexico around October 31, 2006, and asked Rodriguez to keep two kilograms of cocaine for him in exchange for $100. Rodriguez stated that he was "really short on money" and agreed. Rodriguez reiterated in his written plea agreement that he agreed to allow Mendoza to store two kilograms of cocaine at his house for $100. As related in the PSR, Rodriguez also said during his post-arrest interview that on November 2, Mendoza and Perez came to his house and informed him that they were taking a half kilogram of the cocaine. According to Rodriguez's statement, after the cocaine was cut and weighed, Perez left

with it, telling Mendoza he would return in one hour with the money. These facts, too, are essentially reiterated in Rodriguez's written plea agreement. Rodriguez also indicated in his post-arrest interview that later on November 2 Mendoza began calling Perez and saying things to the effect that Perez had robbed him of the cocaine because he had not returned with the money. According to Rodriguez's statement, Mendoza left Rodriguez's house, saying that he would return the next day to get the rest of the cocaine. Rodriguez did not testify at Mendoza's trial; he was still a fugitive.

Mendoza's PSR recommended a two-level enhancement under U.S.S.G. § 3B1.1(c) for Mendoza's role in the offense. The recommendation was based on the following: (1) Mendoza provided Perez with the cocaine[1] and, therefore, claimed the right to a larger share of the proceeds of the sale of the cocaine; and (2) Mendoza recruited Rodriguez to store the approximately two kilograms of cocaine in Rodriguez's basement. The PSR indicated that it appeared that Rodriguez would not have been involved in the offense had Mendoza not recruited him to store the cocaine for Mendoza.

Over Mendoza's objection, the district court applied the two-level enhancement under U.S.S.G. § 3B1.1(c). The court first inferred that Perez was subject to Mendoza's

---

[1] The PSR actually says "[t]he defendant provided Mendoza with the cocaine," but this is an obvious error since Mendoza is the defendant. The factual narrative describing the offense reflects that "Perez" should have been used here instead.

control as to the sale price of the cocaine. This inference was drawn from the evidence that prior to Perez's arrest on November 2, 2006, Lukens twice spoke on the phone with Perez. In the first call, Lukens asked Perez if he could purchase one-half kilogram for $9,000, and Perez said he didn't know, he would have to talk to his friend. During the second call, Perez told Lukens he could sell him one-half kilogram for $10,500. While they were talking this second time, Lukens could hear someone in the background talking to Perez. The court relied on its finding that Mendoza exercised decision-making authority over the conspiracy's operations, including controlling where the cocaine would be stored, when it would be sold, how much would be sold, and by whom. The court also found that Mendoza recruited Rodriguez to participate in the conspiracy. Finally, based on its finding that Mendoza controlled Perez and dictated the price, the court also inferred that Mendoza as the source would keep for himself a larger portion of the proceeds of the cocaine sale.

## II.  Analysis

Mendoza challenges the district court's application of the two-level enhancement under U.S.S.G. § 3B1.1(c). He also argues that the court erred in failing to give meaningful consideration to his arguments for mitigation under 18 U.S.C. § 3553(a). We review a sentence for reasonableness under a deferential abuse-of-discretion standard. *United States v. Sainz-Preciado*, 566 F.3d 708, 716 (7th Cir. 2009).

**A. U.S.S.G. § 3B1.1(c)**

Mendoza first challenges the district court's application of U.S.S.G. § 3B1.1(c). He contends that the district court drew erroneous inferences and relied on evidence lacking sufficient indicia of reliability.

We review de novo the district court's application of the Guidelines. *United States v. Abbas*, 560 F.3d 660, 662 (7th Cir. 2009). The district court's finding that the defendant played an aggravating role in the offense is reviewed for clear error. *Sainz-Preciado*, 566 F.3d at 714. "If there are two permissible views of the evidence, the fact finder's choice between them is not clearly erroneous." *United States v. Hatten-Lubick*, 525 F.3d 575, 580 (7th Cir. 2008).

Under U.S.S.G. § 3B1.1(c) a two-level enhancement is appropriate where the defendant was a manager or supervisor in any criminal activity not described in § 3B1.1(a) or (b). The "central concern" of § 3B1.1 is the defendant's relative responsibility for the commission of the offense. *United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008) (quoting *United States v. Skinner*, 986 F.2d 1091, 1097 (7th Cir. 1993)). The district court found that this enhancement was appropriate because Mendoza controlled the price at which the cocaine would be sold, exercised decision-making authority over the conspiracy's operations, recruited Rodriguez to participate in the conspiracy, and kept a larger share of the proceeds of the crime.

The record supports the district court's finding that Mendoza played an aggravating role in the conspiracy. Rodriguez indicated in his plea agreement and at his

change of plea hearing that he allowed Mendoza to store two kilograms of cocaine at his house at Mendoza's request (in exchange for $100). We have recognized that a drug dealer's recruitment of an accomplice supports application of § 3B1.1. *See Hatten-Lubick*, 525 F.3d at 580-81 (concluding that § 3B1.1 enhancement was not clearly erroneous where the defendant recruited another individual to be his runner); *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008) (deciding that district court did not err in applying § 3B1.1 where the defendant recruited another person to recover drugs from hidden compartments in trucks driven to Chicago), *cert. denied*, 129 S. Ct. 300 (2008); *United States v. Ngatia*, 477 F.3d 496, 501 (7th Cir. 2007) (upholding § 3B1.1 enhancement where the defendant recruited drug couriers and trained them on how to swallow heroin pellets). Rodriguez's factual assertions in his plea agreement and Rodriguez's post-arrest statement reflect that Mendoza recruited Rodriguez to store the cocaine at Rodriguez's house. Therefore, the district court did not clearly err in finding that Mendoza's recruitment of Rodriguez to store the cocaine qualified Mendoza for the § 3B1.1(c) enhancement.

Mendoza argues that the district court's finding that he recruited Rodriguez to join the conspiracy was based on unreliable hearsay—Rodriguez's uncorroborated, self-interested statements. The district court may rely on hearsay evidence in making sentencing determinations as long as such evidence is reliable and the defendant has an opportunity to rebut that evidence. *See United States v. Omole*, 523 F.3d 691, 701-02 (7th Cir. 2008); *United*

*States v. Schaefer*, 291 F.3d 932, 942 (7th Cir. 2002). While it is true that Rodriguez did not testify at trial, was a fugitive, and may have been motivated to downplay his own role in the conspiracy, these considerations did not require the district court to reject his post-arrest statements and admissions in his plea agreement. *See United States v. Johnson*, 489 F.3d 794, 797 (7th Cir. 2007) ("[E]ven the testimony of a potentially biased witness is sufficient to support a finding of fact."). Though Rodriguez may have had some interest in minimizing his role in the conspiracy, he also had an interest in being truthful when making his plea statements—his plea agreement and the benefits he sought from it depended on his truthfulness. In addition, the factual statements in Rodriguez's plea are consistent with Rodriguez's post-arrest statement that Mendoza asked him to keep two kilograms of cocaine for him in exchange for $100.

We do not require that the testimony of a biased witness be corroborated by other evidence to justify the district court's reliance on such testimony. *See Johnson*, 489 F.3d at 798. However, the testimony of Rodriguez's wife, Jaime, lends some support to Rodriguez's assertion that he stored the cocaine at his house at Mendoza's request. Jaime stated that Mendoza had been to her house only once and that was the date of Rodriguez's arrest. She also said that while Mendoza was at her house, she over-heard him telling her husband that Perez had robbed Mendoza of his dope. This testimony reasonably supports the inference that Mendoza's presence at the Rodriguez home was directly related to Rodriguez's later arrest and to the cocaine at Rodriguez's house.

We note that the district judge who sentenced Mendoza (Judge Frederick J. Kapala) was not the district judge (Judge Philip G. Reinhard) before whom Rodriguez pled guilty. Thus, Mendoza's sentencing judge did not have the opportunity to assess Rodriguez's credibility while testifying at his plea hearing. Nonetheless, the sentencing judge could weigh the considerations noted above, consider the evidence and record before him, and reasonably conclude that Rodriguez was being truthful in asserting that Mendoza asked Rodriguez to store Mendoza's cocaine for him. We therefore find no error in the district court's determination that Mendoza recruited Rodriguez to join the conspiracy.

Mendoza further contends that no reliable evidence supports the district court's finding that he controlled the transactions or his co-conspirators. Mendoza argues that Perez, not he, directed and controlled the drug conspiracy and transactions. To be sure, Perez played a significant role in the conspiracy: he met with and delivered the cocaine to Lukens. But the record supports the finding that Mendoza played an even greater role. Mendoza doesn't challenge the district court's finding that he owned and supplied the cocaine delivered to Lukens. Although ownership of the drugs involved in a conspiracy is not a factor listed in the application notes to § 3B1.1, U.S.S.G. § 3B1.1 cmt. n. 4, Mendoza's ownership of the cocaine permits a reasonable inference that he had control over whether, when, to whom, and how much of the cocaine would be sold. Further, reliable evidence supports the district court's finding that Mendoza controlled where the cocaine would be stored—he arranged with Rodriguez to store it at Rodriguez's house for $100.

Mendoza submits that Perez implied in telephone conversations with Lukens that Perez had a second source for the lower quality cocaine. Along these lines, Mendoza argues that Perez did not have to check with him about quantities and prices of the cocaine. But Perez's statement that "the other guy, he's not ready," didn't necessarily refer to a second source. Perez never named his source in his conversations with Lukens. Perez's reference to the "other guy" very likely could have been a reference to the same person that he referred to earlier as "his guy" or "his friend." Or the "other guy" could have been a reference to Perez's source's source. We simply do not know. It seems that Perez's reference to the "other guy" may have been intended to shift the responsibility for not having the "lower quality" cocaine that Perez had said was available only forty-five minutes before onto the source, rather than on Perez. Nor do we know for certain that Perez's reference to the "other guy" was a reference to a person. Drug dealers often use code words to discuss drug types, drug amounts, and drug transactions. *See, e.g.*, *United States v. Fuller*, 532 F.3d 656, 663 (7th Cir. 2008); *United States v. Seymour*, 519 F.3d 700, 713 (7th Cir.), *cert. denied*, 129 S. Ct. 527 (2008). It could be that Perez's reference to the "other guy" was a reference to the other quality of cocaine that he and Lukens had discussed in the earlier telephone call.

Furthermore, the evidence of the November 2 telephone conversations between Lukens and Perez supports a reasonable inference that Mendoza set the price at which Perez could sell the cocaine to Lukens. In the 1:35 p.m. phone call, Perez said he had the same kind of

stuff that he gave Lukens the last time and Perez could give it to Lukens for $9,000. Perez also stated that it would be $10,500 for the "good stuff." In the 2:18 call, however, Perez indicated that he couldn't do the $9,000, but could get Lukens the $10,500 cocaine. This second conversation occurred after Perez had a chance to confer with Mendoza about what cocaine and how much he could get to deliver to Lukens. And although Perez claimed that the cocaine he was going to give Lukens for $10,500 was "better stuff," that is, better than the kind that Perez gave him in their last deal, nothing in the record confirms that the cocaine actually was a higher quality. The cocaine that Perez was promising Lukens could have been the very same kind of stuff that Perez had given him before; Mendoza very well could have decided that it would cost more this time around.

But according to Mendoza, Perez was checking only on the availability of the particular quantities of particular drugs, just as any seller would check with his supplier to find out what he had in stock. Mendoza's interpretation may be reasonable. However, an equally reasonable conclusion from this evidence is that Perez had to check with Mendoza to find out what quantity he could deliver to Lukens and at what price. At 1:35 p.m., Perez thought he could get the "same kind" of cocaine for Lukens for $9,000. But, after talking to Mendoza, he could only deliver the cocaine for $10,500. The price had changed—at Mendoza's direction. As stated, the fact that Mendoza owned the cocaine lends support to this inference.

In addition, although Perez never explicitly told Lukens that he needed permission to set the price, Perez repeat-

edly told Lukens that he had to "find out" and he would "let [Lukens] know," or that Perez had to "talk to his guy" or "his friend." When Lukens asked for a price break for the next transaction, Perez couldn't promise him anything at the time. Instead, Perez put him off by saying, "we can talk in person later." Perez may have done so because he knew he would have to get Mendoza's approval for any "money break"; Perez could not agree to one on his own. All of this evidence supports the reasonable inference, which the district court drew, that Perez had to check with Mendoza on the quantities and price of the cocaine *because* the quantities and prices were set by Mendoza. This evidence may permit other reasonable inferences as well but the inference that Mendoza set the price was a reasonable one. We therefore find no error in the district court's conclusion that Mendoza dictated the price of the cocaine.

The record also supports the reasonable inference that Mendoza controlled Perez. Mendoza made arrangements with Perez to sell the cocaine and instructed Perez to go to Rodriguez's house to pick up the cocaine and then return with the money. Sara Hernandez testified that Mendoza had said that Perez had run away with his money, which raises the reasonable inference that Mendoza thought Perez had disobeyed his instructions to return to Rodriguez's house with the money after the delivery. At the very least, Mendoza played a coordinating or organizing role in the conspiracy involving himself, Perez, and Rodriguez. *See United States v. Pira*, 535 F.3d 724, 730 (7th Cir. 2008) ("'[A]n upward adjustment under section 3B1.1(c) does not require an explicit

finding that the defendant exercised control, so long as the criminal activity involves more than one participant and the defendant played a coordinating or organizing role.'" (quoting *United States v. Carrera*, 259 F.3d 818, 827 (7th Cir. 2001))), *cert. denied*, 129 S. Ct. 583 (2008).

The final basis for the § 3B1.1 enhancement was the district court's inference that Mendoza as the source of the cocaine would keep for himself a larger share of the proceeds. Mendoza claims this finding is in error. The record does not contain any direct evidence that Mendoza claimed a larger share of the proceeds. However, the evidence that he owned the cocaine along with the reasonable inference that he set the price of the cocaine permit a reasonable inference that he laid claim to a larger share of the proceeds. We note that Mendoza was aware before sentencing that the PSR recommended application of the § 3B1.1 enhancement based in part on the conclusion that he claimed a right to a larger share of the proceeds. Mendoza could have offered contrary evidence at the sentencing hearing. He failed to produce any evidence to challenge this conclusion.

We reject the remainder of Mendoza's arguments. He asserts that the evidence proves that his role was only that of a middleman or supplier, which is insufficient for the aggravating role enhancement. He is incorrect, both legally and factually. While merely being a distributor is insufficient to support the enhancement, *United States v. Pagan*, 196 F.3d 884, 892 (7th Cir. 1999), being "a mere middleman" does not make a defendant "immune from application of § 3B1.1," *Sainz-Preciado*, 566 F.3d at 715

(quoting *Howell*, 527 F.3d at 649). It is the defendant's relative responsibility and control over other participants that matters. *Id.* As for the evidence, as discussed, the record supports the finding that Mendoza was no mere middleman or supplier.

Mendoza also argues that a pure fronting arrangement is insufficient to support the enhancement. True, evidence of a fronting arrangement, without more, is insufficient to show the control required for an aggravating role enhancement. *United States v. Guyton*, 36 F.3d 655, 662 (7th Cir. 1994). However, the district court rejected the claim that the relationship between Mendoza and Perez was a mere fronting arrangement. This finding is supported by reliable evidence, including the inference that Mendoza controlled the price of the cocaine to be sold by Perez. Mendoza's greater role in the conspiracy is also established by the evidence that he exercised control over the conspiracy as well as the evidence that he recruited Rodriguez to join in the conspiracy.

Mendoza had greater responsibility for the conspiracy than either Rodriguez or Perez. The district court did not err in applying a two-level enhancement under § 3B1.1 for Mendoza's role in the offense.

### B.  Arguments for Mitigation Under 18 U.S.C. § 3553(a)

Mendoza contends that the district court erred by failing to articulate any reason for rejecting his arguments for mitigation under 18 U.S.C. § 3553(a). In par-

ticular, he cites the effects his likely deportation would have on him and his family and his claim that a shorter sentence would assist him in readjusting to life outside the United States.

A sentencing court can take into account a defendant's status as a deportable alien. *See, e.g., United States v. Panaigua-Verdugo*, 537 F.3d 722, 728 (7th Cir. 2008) (stating that the district court "engaged with [the defendant's] concerns regarding the effects that the sentence and subsequent deportation would have on his family"). But Mendoza cites no authority that requires the court to address the negative effects of a defendant's deportation if the court is not persuaded that a sentence reduction is warranted.

In sentencing a defendant, the district court is required to consider the § 3553(a) factors and to address any substantial arguments the defendant made. *See Martinez*, 520 F.3d at 753. However, the court need not discuss every factor, "as long as 'the record confirms meaningful consideration of the types of factors that section 3553(a) identifies.'" *Sainz-Preciado*, 566 F.3d at 716 (quoting *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006)). The court may reject "stock arguments" without discussion. *Martinez*, 520 F.3d at 753 (citing *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008)). The district court did not specifically discuss the effects of Mendoza's likely deportation and expected separation from his wife and minor children. Nor did the court specifically discuss some of

Mendoza's other arguments for a shorter sentence.[2] However, the record reflects that the court considered those arguments.

At the sentencing hearing, defense counsel raised Mendoza's likely deportation as a mitigating circumstance, arguing that Mendoza would be "forever separated from his children wh[o] are United States citizens." The court then stated: "The defendant's going to be deported, in any event, so how does deportation factor into the sentencing decision that I have to make? . . . He's going to receive some prison sentence. As a result of that, he's going to be deported." Defense counsel responded by focusing on the fact that the deportation would make Mendoza ineligible for certain programs within the Bureau of Prisons which could have reduced the length of his imprisonment and would make him ineligible to participate in a halfway house. Mendoza's attorney added that in his opinion if Mendoza was returned to his native country sooner, he would have a better chance of readjusting to life there. Counsel also thought a quicker return would lessen any temptation Mendoza would have to return illegally to the United States. The district court gave Mendoza the opportunity to address the court, but he declined to do so.

---

[2] These include: that Mendoza financially and emotionally supported his children; his lack of prior criminality; his age; that he was lawfully in the United States; that he was employed and contributed taxes; and that a minimum Guidelines sentence would be greater than the sentences imposed on Perez and Rodriguez.

Mendoza's deportation argument strikes us as nothing other than a stock argument that is routinely, and increasingly, made to the district courts. *See United States v. Meza-Urtado*, 351 F.3d 301, 305 (7th Cir. 2003) (noting that requests for departures based on a defendant's status as a deportable alien seemed to be increasing in frequency). Every deportable alien would be ineligible to participate in certain BOP programs or in a halfway house and could argue for mitigation based on deportability. And it does not seem that Mendoza would be alone in claiming that deportation would separate him from his family. As such, Mendoza's deportation argument was not a substantial one requiring explicit discussion by the district court.

It also seems to us that the district court did take defendant's arguments for mitigation into account. First, it is incorrect to claim the district court passed over his arguments in silence. As noted, the court discussed Mendoza's likely deportation with his counsel during the hearing, saying "defendant's going to be deported, in any event. . . ." In addition, the court had just heard testimony from Mendoza's sister-in-law Sandra Mendoza who testified that Mendoza had been gainfully employed in a lawful occupation for the 30 years she had known him; that he made his court-ordered child support payments and kept current on them; and that he was a good father and supported his children. Sandra also said that Mendoza was a lawful permanent U.S. resident, but his children were U.S. citizens. Finally, she testified to the financial and emotional impact that Mendoza's likely deportation would cause his young

children. Thus, Sandra's testimony touched on all of Mendoza's arguments for mitigation but two: his criminal history and the fact that under the Guidelines, he would receive a greater sentence than his codefendants. This is not a case where the district court could have overlooked some arguments or evidence that were presented to the court in documentary form. Sandra testified right in the presence of the sentencing judge. We have no reason to think that the judge wasn't attentive during her testimony. In fact, at one point, he reminded her that her statements were being translated and that she should speak slowly. This suggests that the judge was, in fact, paying close attention to Sandra's testimony.

Furthermore, the district court stated that it had considered Mendoza's arguments:

> I've considered the presentence report and the accompanying materials. I have considered the arguments made by the government and the defendant. I've considered Sandra's [Mendoza's sister-in-law] testimony. I've considered the sentencing guidelines calculations and all of the other sentencing factors contained in Section 3553(a).

And in discussing the § 3553(a) factors, the district court specifically mentioned several of them: the nature and circumstances of the offense, the history and characteristics of the defendant, the need for specific and general deterrence, and the need to protect the public from further crimes by Mendoza. The characteristics of the defendant would seem to include Mendoza's alienage and likely deportation as well as his age, employment,

and his history of supporting his children, both finan-cially and emotionally. There is no requirement that the sentencing judge must use a formulaic checklist to tick off each point asserted in aggravation or mitigation. *See United States v. Castaldi*, 547 F.3d 699, 706 (7th Cir. 2008) (stating that the district court need not "proceed in a checklist fashion" through the § 3553(a) factors).

The district court also explained that it thought Mendoza's criminal history category understated his criminal activity, noting his prior DUI, his admission that he sold cocaine in the past, and his past ownership of a vehicle with secret compartments suitable for hiding drugs. The court articulated sound reasons why a greater sentence was warranted for Mendoza than for either Perez or Rodriguez. Thus, in explaining its reasons for imposing the sentence that it did, the district court explicitly discussed the two factors that were not touched upon by Sandra's testimony. Finally, the court said that it had determined that a sentence within the Guidelines range was "most appropriate in this case" and that a sentence of 120 months was "suffi-cient but not greater than necessary to comply with the purposes of" § 3553(a).

Moreover, after imposing sentence the court asked defense counsel if the court had addressed all of defen-dant's arguments. Counsel said "yes." This reflects that the district court did address the defendant's argu-ments—at least Mendoza's attorney thought so at sen-tencing. Had the district court overlooked a substantial argument, defense counsel had the opportunity to say

so. Given the record made at sentencing, we can be reasonably assured that the district court took the effects of Mendoza's likely deportation as well as his other arguments for mitigation into account in determining the appropriate sentence.

Although the district court did not explicitly discuss each of Mendoza's arguments for mitigation, the court considered them. The district court also gave meaningful consideration to the § 3553(a) factors and adequately explained its reasons for imposing a within-Guidelines 120-month sentence. Nothing presented in this appeal undercuts the imposition of a presumptively reasonable within-Guidelines sentence. *See United States v. Turner*, 569 F.3d 637, 640 (7th Cir. 2009) (indicating that when the district court followed the proper procedures in determining a sentence, a within-Guidelines sentence is presumed reasonable); *Castaldi*, 547 F.3d at 706 ("A within-guidelines, properly calculated sentence is presumptively reasonable.").

## III.

For the foregoing reasons, the appellant's sentence is AFFIRMED.