**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 4, 2010
Decided August 10, 2010

**Before**

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 10-1381

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 09-CR-114-C-01 |
| MICHAEL D. STARK, *Defendant-Appellant.* | Barbara B. Crabb, *Judge.* |

**O R D E R**

Michael Stark pleaded guilty to one count of possessing with intent to distribute methamphetamines. *See* 21 U.S.C. § 841(a)(1). Stark appeals the district court's decision to increase his prison sentence based on its determination that he managed or supervised others in the commission of the offense. *See* U.S.S.G. § 3B1.1(c). Because Stark recruited and directed at least two others to make regular trips from Wisconsin to Minnesota to pick up drug shipments for him, the district court did not clearly err in deciding Stark was a manager, and we affirm the court's judgment.

**Background**

Police had been investigating Stark's drug activities for several years before arresting him in December 2008. At that time, one of Stark's regular customers, Cory Mlejnek, began

cooperating with police and agreed to set up a controlled purchase of roughly 10 grams of methamphetamine from Stark at his residence.  Police arrested Stark after the deal happened and they found an additional 30 grams of methamphetamine, drug paraphernalia, and a drug ledger during a subsequent search of Stark's home.  Stark entered a written agreement to plead guilty to one count of drug possession with intent to distribute.

According to the presentence investigation report, Stark was a large-scale methamphetamine dealer in northwestern Wisconsin.  The probation officer recommended a two-level increase under U.S.S.G. § 3B1.1(c) because Stark had enlisted several people to transport drugs at his direction and he recruited others to sell the drugs that Stark fronted them.  Stark submitted over 20 objections to the presentence report, including his denial that he acted as a manager or supervisor of the criminal activity.  He did not, however, object to the report's notation that Wendy Zezza had transported drugs for Stark at least 20 times or that he had enlisted another woman to transport drugs for him on occasion, too.

At the sentencing hearing the government called three witnesses—Mlejnek, Zezza, and David Thurs—to testify about Stark's role in the offense.  First, Thurs testified that Zezza, his then-girlfriend, introduced him to Stark in July 2006 after she told Stark that Thurs had a contact in St. Paul, Minnesota, who could supply Stark with drugs.  In describing his initial meeting and first trip for Stark, Thurs said that he had gone with Zezza to Stark's house, Zezza had gotten out of the car to speak with Stark, and she had returned with an envelope containing $6,500.  The pair then traveled to St. Paul where they used most of the money, minus approximately $500 each in compensation, to purchase a quarter of a pound of methamphetamine for Stark and transport it back to Stark's house.  According to Thurs, he and Zezza continued to make these trips for Stark approximately every other week for the following year.  Each time Stark would call Thurs when he was ready for the next shipment, and then Thurs and Zezza would pick up the money, make the trip to St. Paul, return with typically 4 ounces of methamphetamine at a time, and deliver the drugs to Stark's home.  When asked about his compensation for these trips, Thurs explained that he and Zezza usually got about $500 each up front, which was taken out of the money Stark gave them before each trip, but that the amount fluctuated somewhat depending on the price of the drugs.  Although Thurs could not recall a specific conversation about compensation with Stark, he explained that Zezza had worked out the deal with Stark or one of his associates.  On cross-examination, Thurs conceded that because Zezza made the initial contact with Stark, he could not say whose idea it was to start trafficking drugs in this way.

During Zezza's testimony, she confirmed that beginning in 2006 she and Thurs had made regular trips to St. Paul to pick up methamphetamine for Stark.  Zezza could not

remember whether the initial idea for these trips came from her or Stark. But Zezza confirmed that once she and Thurs agreed to transport the drugs for Stark, all of the trips were arranged by Stark, who contacted Thurs to schedule pick-ups as needed. When asked about her compensation arrangement with Stark, Zezza said that she got paid before the trips but that she was not certain whether Stark knew that she and Thurs were taking a portion of the drug money. According to Zezza, Thurs "was the one that handled a lot of the money stuff and transporting and stuff" and that she was "just kind of there" as a passenger.

Mlejnek, the government's third witness, described meeting Stark in August 2008, when he and a friend went to Stark's house to buy drugs. Mlejnek began regularly purchasing methamphetamine from Stark in amounts ranging from a sixteenth of an ounce to an ounce at a time. Initially he paid up front, but as the amounts increased Stark began to front him the drugs. Stark knew Mlejnek was selling some of the methamphetamine to other customers and that he used the proceeds to pay Stark back for the fronted drugs. On cross-examination Mlejnek conceded that while Stark may have agreed to sell him larger amounts of methamphetamine so that Mlejnek to could sell to others, Stark did not keep track of Mlejnek's customers and ultimately did not care what Mlejnek did with the drugs as long as Stark got paid.

In arguing against the § 3B1.1 adjustment, Stark pointed out that there were several inconsistencies in the testimony from Zezza and Thurs, and emphasized that neither of them could recall how they came to be Stark's drug runners or who organized the relationship. Stark argued that even accepting the testimony by Zezza and Thurs, it was equally likely that they transported the drugs as a kind of independent business venture and that Stark was *their* customer. Regarding his relationship with Mlejnek, Stark maintained that he did nothing more than sell drugs to Mlejnek and never discussed or directed Mlejnek's use of the drugs. Finally, Stark questioned the credibility of the three witnesses, all of whom understood that "their cooperation would result in favorable treatment" by the government when it came to their own criminal cases.

The district court disagreed with Stark, however, and determined that he qualified as a manager/supervisor because he was responsible for the trips Zezza and Thurs made to St. Paul and because Zezza, Thurs, Mlejnek, and others transported and distributed methamphetamine at his direction. The court sentenced him to 168 months' imprisonment—67 months below the applicable guidelines range and 20 months below the guidelines range if the § 3B1.1 increase did not apply.

## Analysis

On appeal Stark challenges the district court's decision to increase his sentence under § 3B1.1. Section 3B1.1(c) instructs a sentencing court to increase a defendant's base-offense level by two "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity" other than that described in the other subsections of the guideline. Section § 3B1.1(c) applies "as long as the criminal activity involves more than one participant and the defendant played a coordinating or organizing role." *United States v. Pira*, 535 F.3d 724, 730 (7th Cir. 2008) (quoting *United States v. Carrera*, 259 F.3d 818, 827 (7th Cir. 2001)). The purpose of § 3B1.1 is to account for a defendant's "relative responsibility." U.S.S.G. § 3B1.1, cmt. background.

In determining relative responsibility, the commentary to § 3B1.1 provides that sentencing courts should consider the following seven factors in analyzing whether a defendant qualifies for the role increase:

> (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n.4; *see also United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008) (noting that although these factors were provided to help differentiate leadership from management, they can also be used to determine whether defendant had any supervisory role at all). The absence or presence of any single factor is not dispositive in determining the applicability of the increase; instead, the court should consider, on the whole, whether these elements demonstrate the defendant played a coordinating role. *United States v. Matthews*, 222 F.3d 305, 307 (7th Cir. 2000). Evidence that the defendant exercised control over another participant, however, has generally been considered to be the "*sine qua non*" for applying an increase under § 3B1.1. *United States v. Gonzalez-Mendoza*, 584 F.3d 726, 729 (7th Cir. 2009). Such control does not require absolute authority, though, and can include organizing another participant's role in the scheme. *See United States v. Skoczen*, 405 F.3d 537, 550 (7th Cir. 2005) (quoting *United States v. Reneslacis*, 349 F.3d 412, 417 (7th Cir. 2003)). We review a district court's § 3B1.1 determination for clear error. *United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007).

Stark's strongest argument is that his buyer/seller relationship with Mlejnek does not support the § 3B1.1 increase. As Stark points out, evidence of a fronting arrangement, without more, will not support the enhancement. *United States v. Mendoza*, 576 F.3d 711, 720

(7th Cir. 2009). The government has conceded this point on appeal and focuses instead on Stark's control of Zezza and Thurs.

Even disregarding Stark's relationship with Mlejnek, ample evidence supports the district court's application of the § 3B1.1(c) adjustment. Both Zezza and Thurs confirmed that Stark scheduled their trips to St. Paul to pick up drugs. Stark also determined the amount of methamphetamine to be purchased, provided the money for the drugs, and compensated them up front for their work. Stark argues that because there was no evidence about the profits made from these trips, the district court improperly concluded that Stark enjoyed a greater share of the proceeds. But Stark did not share the profits of his subsequent sales with the pair, and the district court could reasonably infer that Stark enjoyed a greater return on his investment than either Zezza or Thurs. *See Mendoza*, 576 F.3d at 720 (noting that district court could reasonably infer that defendant enjoyed larger share of the profits when he owned the drugs and set the purchase price). Zezza and Thurs both testified that their participation was limited to picking up drugs from the supplier and transporting them back to Stark; they had no role in selling the drugs. This shows that the pair executed one function in the larger distribution scheme controlled by Stark, and that they did so at his direction. No more is needed to warrant the increase. *See, e.g., United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008); *Mendoza*, 576 F.3d at 720; *United States v. Bjorkman*, 270 F.3d 482, 494-95 (7th Cir. 2001); *United States v. Carrera*, 259 F.3d 818, 827 (7th Cir. 2001); *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994).

Stark focuses on the uncertainty of how Zezza and Thurs initially agreed to transport drugs for him and argues that it is not clear that Stark recruited them. But even if Zezza or Thurs came up with the idea for Stark to buy from the supplier in St. Paul, or if they initiated the relationship with Stark, this would not negate the fact that once enlisted, Stark exercised control and general decision-making authority over their endeavors. And, although Stark emphasizes the inconsistencies in Zezza and Thurs's testimonies, the district court believed them, and we give great deference to a district court's credibility determinations. *United States v. Fox*, 548 F.3d 523, 529 (7th Cir. 2008). Even assuming that another characterization of the events was plausible based on their accounts, the district court's choice between different permissible views of the evidence would not constitute clear error. *United States v. Hatten-Lubick*, 525 F.3d 575, 580 (7th Cir. 2008).

Accordingly, we AFFIRM the judgment of the district court.